1           IN THE DISTRICT OF THE UNITED STATES OF AMERICA
                FOR THE SOUTHERN DISTRICT OF ILLINOIS

2   _____ )

3   D.W.K., Jr. and parents Mary &   )
    Daniel Kaleta,                   )

4                                    )
                                     )

5                   Plaintiff(s),    ) Case No. **14-847-NJR-SCW**
                                     )

6        vs.                         )
                                     )

7                                    )
    **ABBOTT LABORATORIES, INC.,**       )

8                                    )
                    Defendant(s).    )

9   _____ )

10

11                  **TRIAL DAY 8**-p.m. session

12

13  BE IT REMEMBERED AND CERTIFIED that heretofore on  **3/11/2015**,

14  the same being one of the regular judicial days in and for the

15  United States District Court for the Southern District of

16  Illinois, **Honorable Nancy J. Rosenstengel**, United States

17  District Judge, presiding, the following proceedings were

18  recorded by mechanical stenography; transcript produced by

19  computer.

20

21

22

23

24       *REPORTED BY*:  **Molly N. Clayton, RPR, FCRR**, Official
    Reporter for United States District Court, SDIL, 750 Missouri
25  Ave., East St. Louis, Illinois 62201, (618)482-9226,
                    *molly_clayton@ilsd.uscourts.gov*

1                        **APPEARANCES:**

2          **John Eddie Williams and John T. Boundas** of Williams
Kherkher Hart Boundas LLP, 8441 Gulf Freeway, Suite 600,
3   Houston, TX 77017; and,

4          **Phillip Sampson** of Bracewell & Giuliani LLP, 711
Louisiana, Suite 2300, Houston, TX 77002; and,
5
           **Kenneth T. Fibich** of Fibich Hampton Leebron Briggs &
6   Josephson, LLP, 1150 Bissonnet, Houston, TX 77005; and,

7

8          *FOR DEFENDANT*: **Dan H. Ball** of Bryan Cave - St. Louis, 211
North Broadway, One Metropolitan Square, Suite 3600, St. Louis,
9   MO 63102; and,

10         **Paul F. Strain and B. Michael MacWilliams** of Venable LLP,
750 East Pratt St, Suite 900, Baltimore, MD 21202
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **INDEX OF WITNESS EXAMINATION**

2                              <u>DX</u>      <u>CX</u>      <u>R-DX</u>      <u>R-CX</u>

3    *Ralston, Brian (offer proof) .1927*

4

5                    **INDEX OF EXHIBITS**

6    <u>EXHIBIT</u>              <u>DESCRIPTION</u>          <u>Id'D</u>        <u>Rcv'd</u>

7    *Exhibit 2147*                                          *2032*
     *Exhibit 2150*                                          *2032*
8    *Exhibit 2151*                                          *2032*
     *Exhibit 2155*                                          *2032*
9    *EXHIBIT 2156*                                          *2032*
     *Exhibit 2431*                                          *2032*
10   *Exhibit 2487*                                          *1927*
     *Exhibit 2488*                                          *1927*
11   *Exhibit 2489*                                          *1927*
     *Exhibit 2490*                                          *2033*

12

13                    **MISCELLANEOUS**

14                                          **<u>PAGE</u>**

15   *Motions*                              *1907*
     *Deposition Designation Arguments*     *1928*

16

17

18

19

20

21

22

23

24

25

1              *MR. FIBICH:*  Your Honor, I'd like to address the issue

2     that Mr. Ball addressed with respect to Mary Kaleta's

3     testimony.  He's asked that we iron out any problems that they

4     may have on documents cross examining her.  He referred to the

5     medical records.  Well, the medical records are voluminous in

6     this case.  So I don't know how -- I want to accommodate his

7     concern and accommodate the continuity of the cross on

8     Mrs. Kaleta.  If he is talking about showing medical records of

9     Dr. Taber, Dr. Ralston and Dr. McGonagle, then, you know, we

10    can agree to those.  If he is talking about other things, then

11    I need to see what those are before I can make some sort of an

12    agreement.

13             *MR. BALL:*  Yeah.  I think the -- Mr. Fibich may have a

14    little bit of a misunderstanding because the medical records of

15    Mrs. Kaleta -- not Danny Kaleta, Mrs. Kaleta are not

16    voluminous.  They are -- what he mentioned plus related -- you

17    know, some other related records.  I mean one came up

18    yesterday, obviously, was the psychological testing.  But they

19    are not voluminous the records that pertain just to Mary

20    Kaleta.

21             *THE COURT:*  Well, can you show him what you plan to

22    use on cross?  I mean, do you know at this point?

23             *MR. BALL:*  Well, you know, we don't know, number one.

24    And, number two, part of the purpose of cross examination is

25    not to have them prepare for cross examination.

1          THE COURT:  Well, I guess that's something we need to

2     hammer out.  I'm a little confused why there are objections to

3     the medical records.  I mean...

4          MR. FIBICH:  Mr. Ball kept out our records yesterday.

5     So...

6          MR. BALL:  No, no, we didn't -- we didn't object to

7     the records that were shown to the jury.  All we objected to --

8     and we didn't object to what you were trying to do was like we

9     need to take a step back and look at this notebook and see if

10    we have any specific objections.  That was the only thing.

11         THE COURT:  Okay.

12         MR. BALL:  All the medical records they included

13    school records and things like that.  Okay?  And they included

14    I thought -- although I understood later they didn't have --

15    but they included our expert's report -- although you told me

16    that wasn't in there.  So all I was saying is we have got to

17    take a minute.

18         THE COURT:  Okay.  So let's clear that up from

19    yesterday.

20         Is there any objection to what they offered with

21    respect to the medical records yesterday?

22         Because it was my understanding it was what was shown

23    to the jury plus maybe a page to make it complete.

24         Any objection?

25         MR. BALL:  No objection.  The things that were shown

1   to the jury plus a page or so to make it complete, no

2   objection.

3             THE COURT:  Okay.  So those will be admitted.

4             MR. FIBICH:  Well, again, I'd like to know what it is

5   that we're being asked to agree to.  I understand Mr. Ball

6   wants to surprise this 70 IQ woman with his cross.  But...

7             MR. BALL:  We are not -- we're not asking you to agree

8   to anything.  We are asking you to tell us if you are going to

9   stand up in the middle of a cross examination and lodge

10  objections about medical records that pertain to her.  And you

11  know what's out there.  We all have what's out there.  We were

12  just trying to avoid what happened yesterday when there was a

13  couple of sidebars.  That's all we're trying to do.

14            MR. FIBICH:  Well, first of all, there's some abortion

15  issues in those records.

16            MR. STRAIN:  No, we are not going --

17            MR. FIBICH:  Those are her records.

18            MR. BALL:  This is subject to all of the motions in

19  limine, which have already been agreed to.

20            MR. FIBICH:  Well, I'll go back and look at them and

21  I'm going to tell the Court in all likelihood we will not lodge

22  those objections.

23            MR. STRAIN:  Thank you.

24            THE COURT:  Well, if it is her medical record and as

25  you said from one of her treating physicians, it is relevant to

1    the case, doesn't violate a motion in limine, then I don't know

2    that we have anything to argue about.

3         MR. FIBICH:  Well, what about McGonagle after 2000?

4    We have got that issue.

5         MR. BALL:  Well, they just read -- I just listened to

6    them read into evidence in their case a bunch of stuff about

7    how she continues to have seizures after 1999.  So whatever

8    rule they were trying to make, they just put it all in in their

9    case.  I don't know understand how that could possibly be an

10   objection now.  You just sat there and asked questions about

11   isn't she having seizures even though she is still to Depakote

12   and that kind of thing.

13        THE COURT:  Okay.  Well, I'll just -- sounds like I

14   will just have to take that up tomorrow when it comes up.

15        MR. STRAIN:  Very well, your Honor.

16        MR. FIBICH:  I'm representing to the Court there is

17   going to be very little objections.

18        THE COURT:  Okay.  Well, I appreciate that because

19   I -- you know, I think the jury gets tired of us going to

20   sidebar.  So...

21        MR. BALL:  The other thing before we dive back in, if

22   it is, because I think it is an important issue that we don't

23   want to take any time up tomorrow and that's this issue with

24   Dr. Lott.  May we discuss before we dive back into the depo

25   designations?

1        *THE COURT:*  Yeah.  Are the plaintiffs ready to discuss

2   that issue?

3        *MR. FIBICH:*  I don't know what the issue is.

4        *MR. BALL:*  Well, we filed a motion a few days ago and

5   you guys have responded.  And we mentioned it last night and we

6   mentioned it this morning about his supplemental report and the

7   things covered by the supplemental report.

8        *MR. HENDERSON:*  We have one of our smart lawyers

9   handling this one.

10        *MR. BALL:*  So this -- Nancy, are you going to handle

11   this here?

12        *MS. McEVILY:*  Yes.

13        *MR. BALL:*  So this is going to require a little bit of

14   knowledge.

15        The -- Dr. Lott was identified on September 30th and

16   deposed October 20th.  And he referenced in there the

17   possibility that Daniel at some time would need a colonic

18   procedure to improve his ability to independently control his

19   bowels.  His -- he said I can't make a final decision on that

20   because I'm not a surgeon, I'm a pediatric neurologist.

21   However, I would recommend that she -- that he, you know, see a

22   surgeon and decide on this.

23        We have now, as of March 2nd -- March 2nd, the day

24   trial began, we received records that he had undergone the

25   procedure in November, that he has had follow-up care since

```
 1    that time and is having issues adapting to that.

 2            This is a -- I, unfortunately, have some familiarity

 3    with this from a personal standpoint. They -- what they have

 4    done is the appendix is at the end of the colon.  The colon is

 5    the large intestine.  They cut a hole and bring that back out

 6    and then fluid is injected in there to flush is the procedure.

 7    Okay.

 8            And there is an adaptation period when you have that

 9    because it is a new kind of -- it is doing something the colon

10    is not really designed to do.  And he is going through that

11    procedure now.

12            We then, on March 6th, which was Friday -- I can't

13    remember when it was during the day, sometime during that

14    calendar day we got a supplemental report with a lengthy

15    description of the procedure and a lengthy description of the

16    problems, of the procedure done in November, the -- how long

17    the surgery was, how -- what problems he's had since, various

18    percentages of the success and failure of this kind of thing.

19    Big detailed report, cites to literature.  All that kind of

20    thing.

21            The way this is supposed to happen in trials, in

22    courts, in cases is that under Rule 26(e) there is a duty to

23    supplement.  And so there should have been supplementation to

24    us that we've been in court most of the time, so we had all

25    kinds of back and forth.  There should have been
```

1   supplementation to us that -- where these folks said, hey,

2   guys, our client has undergone this procedure and he is in the

3   recuperation stage from that.  If that had occurred, we could

4   have addressed it.  One of the possibilities is that we would

5   have addressed the Court and said, you know, it is not fair or

6   appropriate to go to trial on somebody who is in the

7   recuperation stage from a surgery and we have got another --

8   we've got two other cases teed up here.  We got two others

9   right in line, so we are just going to move this one back a bit

10  or whatever.  That's one possibility that would have come out

11  of it.

12          And, in addition, we would have had the right to

13  depose the treating doctor, the surgeon that did this to see

14  what his views were on the success, success rates and that type

15  of thing.  Instead of this pediatric neurologist from Irvine,

16  California, who has never done this kind of procedure and

17  hasn't examined Danny Kaleta, we would have had a right to have

18  our own doctor evaluate the situation.  We would have had a

19  right to -- to redepose Mrs. Kaleta on the situation and

20  possibly Danny in this situation.

21          And, you know, I want to just -- this is a serious

22  part of their damages in this case is the ability to

23  independently control the bowels for the long term.  It

24  potentially has an effect on millions of dollars in their life

25  care plan, it has a potential effect on their pain and

1    suffering kind of damages.  There's medical bills, obviously,

2    although they probably pale in comparison to these other

3    things.

4            So if -- we have been troubled by this about what to

5    do.  This is mistrial type of stuff to have this kind of thing

6    not disclosed under Rule 26(e) until a March 6th -- they didn't

7    disclose it, we just got it through medical record collection.

8    The first that it was officially disclosed was March 6th, the

9    fifth day of trial.

10           *THE COURT:*  So wait.  Make -- let me make sure I'm

11   clear on that.  You -- you said you got the records on

12   March 2nd and you got those on your own?

13           *MR. BALL:*  Yes.  We have a medical collection service

14   that was -- you know, periodically updates things.

15           *MS. TREVINO:*  Your Honor --

16           *MR. BALL:*  We were not told by anybody --

17           *THE COURT:*  Okay.

18           *MR. BALL:*  -- that this had even occurred until

19   March 2nd.

20           *THE COURT:*  Okay.  Let me stop you there and have

21   plaintiffs respond.

22           *MR. BALL:*  Because I wasn't -- I'm not asking for a

23   mistrial.  May I finish what I am asking for?

24           *THE COURT:*  Sure.

25           *MR. BALL:*  Okay.  Because when we have thought

1    about -- we do think this is mistrial material but what we

2    think the only fair way to do this -- and we have thought about

3    this a lot to try to accommodate all the competing interests --

4    is that Dr. Lott is limited to talking about what the surgery

5    is and what the purpose is and that Danny is in the -- Danny

6    Kaleta is in the recuperation stage from that, period.  And not

7    get into all of the other stuff that's in his report about --

8    and this would also apply to the family members, too, that they

9    not -- we not get into all this other stuff about he is having

10   problems adapting and what the outcomes are going to be

11   long-term that's in Dr. Lott's report, what his -- the

12   literature that's in there.  That type of thing.  So that's

13   what we ask is that the family and Dr. Lott be restricted to:

14   He has had this surgery to address the bowel situation, he is

15   in a recuperation stage from that, period.

16          THE COURT:  Okay.  Why -- why weren't they told that

17   he had had this procedure and produced the medical records?

18          MS. McEVILY:  A little -- Nancy McEvily, yes.  Thank

19   you.

20          A little bit of clarification, your Honor.  I actually

21   produced the records.  I think Mr. Ball was mistaken.  I

22   produced the records to Abbott the day before, March 1st.  That

23   was the first day that we had the records.  I know Abbott was

24   seeking them as well.

25          THE COURT:  Okay.  Why did it take you so long to get

1    them?

2         MS. McEVILY:  We had records requests.  Our client

3    called the hospital and asked.  They said she would have to

4    wait.  So we were able to get them -- and that was the first

5    day that we were able to get them.  I can't say exactly why

6    because I don't know what the hold up was particularly.  But

7    that was the first day that we had the records.  A billing

8    record was produced for that surgery in January.  And I don't

9    know if it was clear from the billing record what the procedure

10   was.  But it was clear from Mrs. Kaleta's deposition that the

11   procedure was planned.  So it was certainly disclosed --

12        THE COURT:  When was her deposition?  When was it

13   disclosed in her deposition?

14        MS. McEVILY:  That would have been October.  October

15   of 2014.  I don't have the exact date of her deposition.

16        THE COURT:  Okay.

17        MS. McEVILY:  Mr. Ball mentioned that they might have

18   liked to depose the surgeon who performed the procedure and I

19   can certainly understand that.  The surgeon who performed it

20   was Daniel's urologist, who was identified.  And, in fact, she

21   has been treating him for many years.  And her deposition was

22   never requested before that.  So that's just one point.

23        But part of the reality of Daniel's situation is that

24   his care is ongoing and he required this surgery.  The fact

25   that occurred during trial was not something that, you know,

1    was planned or that we had any control over --

2         THE COURT:  Well, the surgery didn't occur during

3    trial, did it?

4         MS. McEVILY:  I'm sorry.  It occurred during the

5    pendency of the litigation not during trial.  It occurred -- I

6    think his first appointment was November 20th.  And that was

7    for a pre-op procedure to determine whether he was a good

8    candidate for it, to determine whether it could go forward.

9    And then it went forward either the next day or the day after.

10        MR. BALL:  So --

11        MR. STRAIN:  May I just --

12        MR. FIBICH:  Let us have our say first.

13        MR. BALL:  I thought she was --

14        MR. STRAIN:  I just wand to ask Nancy, if I may,

15   because she said that Mrs. Kaleta had revealed it.

16        MR. FIBICH:  Yes, it is Page 172.

17        MR. STRAIN:  That's what I'm looking at.

18        MR. FIBICH:  Line 1, "Is he scheduled for bowel

19   surgery?"

20             How do you get this to go up (computer screen)?

21             "What is he scheduled for?"

22             And the answer is "Bowel surgery."

23             "What is the bowel surgery?"

24             The answer, "So he can have -- it's like an enema.

25   They are going to put a hole like in the belly button area,

1    fluid will go in, fill him up.  He will be sitting on the

2    toilet and he would go.

3              "He will be able to move his bowels?"

4              "Well, it will be forced out basically.

5              "And when is this -- that surgery scheduled?"

6              "I have to schedule it, but I have the package and

7    everything, the papers.

8              "Is there a name for that procedure?"

9              "MACE.

10             "And who is the physician that will perform that?"

11             "Dr. Yerkes."

12             "This is a procedure that definitely will take place?"

13             Answer, "Yes."

14             And I could go on but that was disclosed in October.

15             *MR. STRAIN:*  Yeah.  And that's what I wanted to

16   confirm, if I may.  I believe that was the only mention of it.

17   She said that she would schedule it.  This was October -- a

18   date -- on October 14th we received no notification it had been

19   scheduled or had taken place.  Obviously, we would have asked

20   immediately for the records.  If we knew it had happened, we

21   would have asked immediately for the records.  I don't know

22   why -- and the medical records collector does not take four

23   months to get records.  It is a couple of weeks.  We had been

24   told -- I understand it happened in November, at least that's

25   my general understanding.  We could have had these by

1    Thanksgiving.  And all this could have been done with the

2    discovery or whatever.

3           MR. BALL:  So that's why with this whole set of

4    circumstances, your Honor, that's why we are trying to find a

5    way to not have this -- the work that has been done by the

6    parties be not appropriate.  And we think the best thing to do

7    is let them mention the surgery, let them say it has occurred.

8    He is in the recuperation stage, all of which is true.  But not

9    get into he's having these problems now, what's going to happen

10   out in the future.  Because that is just pure speculation as to

11   where he is going to go in the future.  Pure speculation.  He

12   is in the midst of adapting to this whole thing both in terms

13   of how to do it and his body adapting.  And that is not our

14   fault that we are in this situation now.  Because if we had

15   been -- received a supplemental discovery response to their --

16   that said he has been -- he has now had this surgery and he is

17   getting follow-up care, we could have brought that to

18   everybody's attention.

19                    *(Attorneys conferring)*

20          MR. FIBICH:  Your Honor, again, Ms. McEvily has stood

21   before you as an officer of the court, said we requested the

22   records as soon as we knew about it and they were late getting

23   to us.  That's not our fault.

24          MR. BALL:  I'm --

25          MR. FIBICH:  As an officer of the court she has made

1    that representation to you.

2           And, second of all, the entire procedure was discussed

3    in her deposition.  It's been -- it hadn't been scheduled but

4    everything was there.  And it had, you know, all the details of

5    what you know had happened.

6           And if you will recall, it was on opening statement

7    that I first brought it up, that we had to insert the tubing to

8    inject the enema that allows him to go to the restroom.

9           *MR. BALL:*  So I think we're missing the point here.

10   The point is not whether they could have gotten the records

11   earlier than March 1 or not.  I do find that if they -- it had

12   been known in November, I find it -- my experience is usually

13   they're before that.  But putting that aside, if we had just

14   known that this significant procedure had occurred, that's --

15   that comes from their client, that doesn't come from some

16   doctor, or hospital, or anything.  If there had been given a

17   heads up to us, and the Court, and everybody else, then we

18   could have said, okay, what do we do now.

19          This is a major surgery that has occurred.  And it

20   took four -- according to Dr. Lott, it took like five hours to

21   do.  It had complications to it during the surgery.  This is

22   certainly something -- and do we -- had we known about the fact

23   that there had been a urologist before?  Sure.  But there

24   weren't any indications that that urologist was doing this

25   significant a procedure at this time.

1          THE COURT:  Okay.

2          MR. FIBICH:  Your Honor, I don't want to argue

3   everything over and over to you.  Just let me say this:  I

4   don't see this as that big of a deal, quite frankly.  Remember

5   the alternative was for his mother to put on a rubber glove and

6   evacuate him.

7          So I mean, you know, is this really adding to this

8   kid's damages?  Is this really going to exacerbate the damages

9   in this case given all the problems that this child has?  I

10  mean I just don't see it as being the issue that they're trying

11  to make it.

12         MR. BALL:  Well, have you read Dr. Lott's report?

13         MR. FIBICH:  Yes, sir.

14         MR. BALL:  Okay.  That's the problem.  The problem is

15  not that he had the procedure and that he is going through the

16  recuperation.  We have already said that.  The problem is, is

17  he puts percentages in there based on the literature.  He more

18  or less says it ain't going to work.  Okay?  That he is going

19  to have to have more surgery.  It is not going to cure him and

20  all of this.  And that's where the -- and he is having all

21  these issues, risks, in the bathroom for a long time.  That's

22  the problem.  It is not -- it's both the -- the notification

23  about the procedure -- that's the line we are trying to walk

24  here.  We are trying to accommodate the Court, and the

25  plaintiffs, and everybody that he's had this procedure.  You

1    know, they've got evidence that this is the way that she had to

2    use to do it to help him.  Now he's had a procedure, he's

3    recuperating from it and nobody knows what the ultimate outcome

4    is.

5         *THE COURT:*  Okay.  Well, here's how I see it:  We are

6    not going to argue about this all day because we have

7    depositions to take up.  So the Seventh Circuit tells me to

8    look at whether a Rule 26(a) violation is justified or

9    harmless.  And in doing that consider certain factors,

10   including the prejudice or surprise to the party against whom

11   the evidence is offered, the ability of the party to cure the

12   prejudice, the likelihood of disruption of the trial, and the

13   bad faith or willfulness involved in not disclosing the

14   evidence at an earlier date.

15        So I don't find any bad faith or willfulness in not

16   turning over the records because they said they got it.  But

17   certainly plaintiffs could have told Abbott that he was having

18   the procedure on this certain date or that he had had it on a

19   certain date.  So I think there is some prejudice or surprise

20   at least to Abbott given that they got this in the middle of

21   trial.  And we certainly have enough on our plate because so

22   many things weren't ready for trial to take this up.

23        So I think the ability of the party to cure the

24   prejudice?  I mean we are not going to stop and take

25   depositions.  There is a likelihood of disruption of the trial

```
 1    if we do that.  So I think Mr. Ball's proposal is reasonable.

 2    I will let Dr. Lott say that he had the procedure and that he

 3    is recuperating from the procedure.  And I say Dr. Lott and

 4    that includes the family members but that's it, we are not

 5    going to go into any of the other details that are in his

 6    supplemental report.

 7              MR. STRAIN:  Thank you, Judge.

 8              MR. SAMPSON:  Clarification, if I may.  So he -- he

 9    may talk about the fact that he had the procedure.  May he

10    describe what the procedure is, what the product is, how it

11    works, et cetera?

12              MR. BALL:  Yeah.

13              THE COURT:  Yes.

14              MR. SAMPSON:  And may he describe how the procedure

15    went that Danny went through and -- and how the surgery went

16    based on the records -- I mean to describe --

17              THE COURT:  I think that's fine, to describe that it

18    had it.

19              MR. BALL:  The day of the procedure.

20              THE COURT:  The day -- how it went that day, what it

21    is.  So the jury understands.  And that's it.

22              MR. BALL:  Okay.  Thank you.

23              MR. FIBICH:  One other clarification, your Honor.  And

24    the purpose is to make sure that we are standing by your

25    ruling.  One of the problems that Danny has is that this
```

Motions

1   doesn't work real quick.  So his mother is going to testify

2   that when he does take the injection that he has to go to the

3   bathroom, he can't do anything else.  And it takes a long time

4   for him to evacuate his bowels.  Like an hour.  Now, that's not

5   saying he has got problems and he's going to need --

6       THE COURT:  And that's not -- that's not directly

7   related to the procedure, isn't it?  Didn't he have that

8   before?

9       MR. BALL:  That's part of the recuperation.  See

10   that's now details of the recuperation that if we had -- this

11   had all gone right, that would have played itself out and we

12   would have seen -- they are going to be painting a picture that

13   this is going to be a forever thing, that he is always going to

14   have to sit on the commode for an hour.  And these procedures

15   typically succeed and you don't have to do that.  That's whole

16   problem of getting into what the details are now.

17       And if we had known all this, we would have been in

18   here saying this is not the time to be trying this case.  So I

19   think your ruling was -- and now they're trying to chip away at

20   it some.  The ruling was here's the -- describe what the

21   procedure is, what was done, he's in the recuperation stage,

22   period.  That's it.

23       MR. FIBICH:  Well, first of all, I resent the

24   suggestion that we are try to chip away with it.  I'm not

25   arguing with your ruling.  I respect your rulings.  And I'm not

 1   going to go back.  What I am trying to do is make sure we do

 2   not violate the Court's instruction on what we can say and what

 3   we can't say.  That's my purpose in addressing this issue

 4   before the Court.

 5          Now, what Mr. Ball said was we shouldn't be allowed to

 6   come in with this particular expert and talk about how it is

 7   not working, how it is going to fail, how it is going to be a

 8   lifelong problem, the cost and additional surgeries he is going

 9   to do.  We are not doing any of that.  I'm simply stating a

10   fact, not suggesting it is going to continue forever.  The

11   question that I will ask is, Mrs. Kaleta, how is that working

12   out for Danny, how does he react when the enema is injected

13   into his stomach.  Those are the questions I'm going to ask.

14   It's not getting into future care, it's not getting into future

15   problems, which you have told us we can't get into.

16          *THE COURT:*  Right.  You can ask that question and

17   no -- go no further.

18          *MR. FIBICH:*  Okay.

19          *MR. BALL:*  If we were to then -- I'm not saying we

20   will do this but if we were to then just follow up and say and

21   you understand that he is still in the adaptation stage, that

22   would not be opening any door, that would be the end of it.

23          *THE COURT:*  That's fair.

24          Okay.  Do we have another depo we can take up?

25          *MR. MacWILLIAMS:*  We do, your Honor.

1        *MR. STRAIN:*  I wonder if I may be excused?

2        *THE COURT:*  You may.

3        *MR. STRAIN:*  Mr. Williams tells me I am of no help.

4        *THE COURT:*  Go enjoy the beautiful day.

5        *MR. STRAIN:*  All right.  Thank you, your Honor.

6        *MR. BALL:*  I don't think Paul is doing that.

7        *MR. SAMPSON:*  Your Honor, while they're getting that

8    ready, would you like for us to go ahead and provide the Court

9    or enter into the record these three perscriber depositions?

10        *THE COURT:*  Yes, that would be...

11        *MR. SAMPSON:*  We have -- Exhibit 2489 was plaintiffs'

12    offer of Dr. Timothy McGonagle with the portions read are

13    highlighted.

14        *THE COURT:*  You know, they color coded, highlighted as

15    to --

16        *MR. SAMPSON:*  It is --

17        *THE COURT:*  It's just -- okay.  You've just got it

18    highlighted of what was read.

19        *MR. SAMPSON:*  And some of the transcripts have in

20    handwriting crosses through some of the highlighting because of

21    the Court's rulings.  But the highlighted yellow areas that are

22    not crossed out were read into evidence.

23        The second is the deposition of Jesse Taber.

24    Plaintiffs offer it.  It is Exhibit 2487.

25        And finally we have the plaintiffs' offer of Dr. Brian

1    Ralston, Exhibit 2488.

2              *THE COURT:*  Admitted.

3              And, your Honor, there were a few aspects of what

4    plaintiffs intended to read of Dr. Ralston the Court ruled were

5    inadmissible.  And we would like to, for purposes of an offer

6    of proof, point out the pages where the testimony is crossed

7    out based on the Court's ruling and we would like to simply

8    make an offer of proof of that testimony.

9              *THE COURT:*  Okay.  Go ahead.

10             *MR. SAMPSON:*  So that testimony is contained on

11   Pages 58 and 59; 61 and 62; and 65 through 67 of Dr. Ralston's

12   testimony -- of Dr. Ralston's transcript and will be reflected

13   by testimony that's crossed out.

14             *THE COURT:*  Okay.  Mr. MacWilliams, any objection?

15   You have confirmed that those were the portions that were read?

16             *MR. MacWILLIAMS:*  I'm sorry, your Honor, I didn't --

17             *THE COURT:*  Have you confirmed that those were the

18   portions that were read?  Any objection to these?

19             *MR. BALL:*  I'm assuming that the copies that

20   Mr. Sampson just handed your Honor are identical to the copies

21   from which I read earlier --

22             *THE COURT:*  Okay.

23             *MR. MacWILLIAMS:*  -- and on that basis we don't

24   object.

25             *THE COURT:*  Okay.  Well, these will be admitted.

Depo Examination - Ralston, Brian (offer proof)

1              Okay.  So who do we have next?

2              MR. BALL:  We are still on Dr. Embrescia, your Honor.

3              THE COURT:  Okay.

4              MR. BALL:  And may be for some time.

5              Your Honor, Page 177, Line 3 is where we need to start

6     with the next overarching issue, your Honor.

7              COURT REPORTER:  Page 177, Line 3.

8              MR. HENDERSON:  I have -- excuse me.  Can I cut

9     136:24, and 137:11, 134, to 21.

10             MR. MacWILLIAMS:  I'm sorry.  I'm sorry.  136:24, to

11    what, Mr. Henderson?

12             MR. HENDERSON:  136:24, to 137, Line 11.  Where it's

13    talking about the ethical legal -- and ethical duty.

14             MR. BALL:  I think it starts much earlier than that,

15    Mr. Henderson.  I think it started all the way back.

16             MR. HENDERSON:  Well, that's the only place that I can

17    see what is termed legal and ethical duties.  It uses the term

18    "obligation." but it is such things -- it doesn't talk about

19    the law or ethics in any other instance that I have located.

20             And I thought was the Court's concern.

21             MR. MacWILLIAMS:  I understood your Honor's ruling to

22    go to the duty issue and the ethical.  So whether legal or

23    ethical is your Honor's ruling, as I understood it, was, I'm

24    going to instruct the jury on that, and this isn't coming in.

25             THE COURT:  That was my ruling.  We are not going to

Deposition Designation Arguments

1    talk about duty.  So anything that talks about Abbott's duty is

2    out.

3            MR. MacWILLIAMS:  Okay.  I'm sure on that basis, your

4    Honor, we can figure out where the cuts are.

5            THE COURT:  Okay.

6            MR. MacWILLIAMS:  Next issue, your Honor, Page 177,

7    Line 3.  And I read this question to your Honor because it sets

8    the stage for the next significant issue:

9        "Q    Was Abbott a member of any organization that dealt

10       with the teratogenic potential of pharmaceutical drugs,

11       researched them, investigated them, educated about them

12       between 1978 and 1996?"

13       And I defended Dr. Embrescia at his four depositions, your

14   Honor, so I lodged a compound objection to that question, which

15   asks about a whole bunch of different things at one time.  So

16   that's the first minor issue.  But when it goes on from there,

17   your Honor, and this -- this is where they start asking

18   Dr. Embrescia about a number of registries around the world.

19       And you will recall -- or maybe you won't -- I'm not sure

20   it came out in Dr. Oakley's testimony.  But there is a

21   distinction between birth defect registries and pregnancy

22   registries.  Birth defect registries count babies with birth

23   defects.  Pregnancy registries count babies who were exposed in

24   utero to environmental factors, compounds.

25       So birth defect registries -- it's sort of backward

1    looking.  I've got this baby with a birth defect.  What can I

2    know about that baby?  Pregnancy registry, register the mother

3    ideally -- ideally before she gets pregnant, but next to --

4    before she gives birth -- or, actually, before she knows

5    whether there is a problem with the baby or not, and then track

6    the baby.  Two totally different types of registries.

7         THE COURT:  Okay.

8         MR. MacWILLIAMS:  Okay?

9         The one is what Dr. Oakley says we should have done

10   that acyclovir type registry.  The Dr. Holmes registry added

11   another layer.  This is pregnancy/exposure registries of the

12   Dr. Holmes' type was across drug.  So multidrug exposure

13   registry, not a birth defect registry.

14        So the plaintiffs go on for many pages, starting at

15   199, Line 2:  Would you agree that from 1978 to 1996 Abbott had

16   a duty under federal law to learn about report and --

17        THE COURT:  I'm sorry.  Where are you?

18        MR. MacWILLIAMS:  I'm sorry, your Honor, and I read it

19   too fast for Molly.  199, Line 2, which is a duty question, so

20   I'll skip that one, your Honor.

21        Actually, I'll have to read it to you because it sets

22   up the next question:

23        "Q    Would you agree that from 1978 to 1996 Abbott had

24        a duty under federal law to learn about report and act

25        on adverse event data, no matter where it occurred in

Deposition Designation Arguments

1    *the world?"*

2         So that question is out because of the duty issue.

3    And then you see, your Honor, starting at Page 202, Line 6,

4    what they are asking Dr. Embrescia about is, Did you contact

5    this registry?  Did you contact this registry?

6         So Page 202:  "Did you contact EUROCAT?"

7         Page 207:  "Did you --

8         *THE COURT:*  And EUROCAT is a pregnancy registry?

9         *MR. MacWILLIAMS:*  There is no foundation in

10   Dr. Embrescia's testimony or in Dr. Oakley's testimony or in

11   any other testimony in this case, to my knowledge, your Honor,

12   which it is.  They're asking, Did you talk to EUROCAT?  Or were

13   you aware of EUROCAT?  They haven't asked him the question yet,

14   Have you talked to them?

15        Continuing, Page 207:  Australia, the Western Birth

16   Defects Registry; Page 207, Line 11:  Canada, 1952, Crippled

17   Children's Registry; Page 208, Canada, Congenital Anomalies

18   Surveillance report, 1966; next one, Czech Republic, 1961 and

19   '64; next one, Finland.  And it goes on.

20        *THE COURT:*  Okay.  I get the gist of it.  So what is

21   the relevance of this?

22        *MR. HENDERSON:*  The birth defects surveillance systems

23   take many forms.  Virtually all of the literature that the

24   Court has seen and the jury has heard from this case from

25   Italy, Finland, Australia, everything, are from birth defects

1   monitoring systems.  The distinction between backward looking

2   and forward looking, registry versus register, if Abbott wants

3   to bring that up, they can.

4       Their own advisers told them two things:  Do your own

5   study or find another database -- you will recall from

6   Dr. McMahon and Dr. Feinstein, find another database of

7   somebody that's gathering information about birth defects in

8   children and get that data and use it.  That's what they were

9   advised to do, and they elected not to do that.

10      So what we are pointing out -- and I think one of

11  Abbott's arguments is going to be, well, it was impractical, no

12  one was doing it, science wasn't evolved to that point.  And

13  what we are pointing out here is actually there were 15 or 20,

14  at least, birth defect monitoring systems in place.  And all

15  the information from Dr. Lindhout, Dr. Vauchka [ph], all these

16  people we've heard about all came from these systems.

17      This is where all the data on the dangers of Depakote

18  came from.  It just came from them without any input from

19  Abbott, without any communication from Abbott.  And one of the

20  points in the notice for Dr. Embrescia was "communications with

21  reporters and third parties about adverse event reports on VPA

22  and drugs."  Dr. Embrescia said -- and I don't think it's in

23  any of cuts we have here because we didn't think that was

24  relevant.  Part of Abbott's obligation, if there is an adverse

25  event from any of these surveillance systems that identifies a

1   patient who is exposed to Depakote and had a child with a

2   congenital malformation, they had a federal, legal duty to

3   report that to the FDA.  If you can identify a patient, it's

4   considered an adverse event report.

5          So that's what we were asking about, Did you make any

6   effort to communicate with these people that were amassing this

7   data around the world?  And he did admit, no, they did not.

8   That's -- it goes not only to the practicality of doing the

9   register, it goes to notice of what was going on, and it also

10  goes to the fact that they were acting unreasonably in doing

11  nothing.

12         *MR. MacWILLIAMS:*  Your Honor, the giant gaping hole in

13  that analysis is that there is no evidence that any of these

14  birth defect registries generated a single adverse event

15  relevant to Depakote of which Abbott had any obligation to be

16  aware.  What Mr. Henderson is alluding to is, if we get AE's --

17  shorthand for adverse events -- we are supposed to do certain

18  things with them.  We report them to the FDA.  I defy

19  Mr. Henderson or Dr. Blume or anybody else to suggest that we

20  have an obligation to go to Finland and ask a birth defect

21  register in Finland, gee, what adverse events might you have

22  about Depakote-related births.  There is absolutely no

23  foundation.

24         The implication is, of course, you should have been

25  scouring the earth to find every piece of birth defect

Deposition Designation Arguments

1   information that might have been available.  There's not a

2   single piece of evidence that suggests that there was one piece

3   of information in the Czech Republic's birth defect registry

4   that connected a birth defect to Depakote.  They just want to

5   paint the picture.  Why didn't you go scour the earth for all

6   these things that, as far as you and I and Mr. Henderson know,

7   are totally irrelevant.

8        *THE COURT:*  Okay.  And I was just handed this

9   deposition.  I haven't read it.  Is there anything that

10  connects it that says that there was something in these

11  registries?

12       *MR. HENDERSON:*  Every one of these registries -- let

13  me put it this way:  Many of these registries produced the data

14  in all the articles we've talked about.  Dr. Martinez-Frias was

15  at the Spanish registry.  That's mentioned.  Dr. Lindhout was

16  at the Finnish registry.  That's mentioned.  Dr. Patino and

17  those doctors were at the Italian registry.  That's mentioned.

18  That's where all that data originated.

19       What Abbott did was waited for the data to come to

20  them.  And my question was:  Did you do anything to go out and

21  seek data about your drug?  And he admits they did nothing.

22  That's where all this data came from.

23       Austria is mentioned in here.  That's where all the

24  data -- the French registry is mentioned right here on

25  Page 209.  And there were, like, three French registries.

1   That's where all the data came from.

2         So the question was:  Did Abbott do anything --

3   whether or not you were advised to do it by your consultants.

4   But their consultants came in at this exact time, in 1982, and

5   said, Go seek data.  Go seek a database to learn about the

6   safety of your drug.

7         And I think Abbott is going to say, Well, we didn't

8   know.  We couldn't do anything.  There was nothing out there

9   that would help us with this.  This goes directly to point to

10  show that there were databases they could have consulted if

11  they had elected to do so.  And they chose not to.

12        MR. MacWILLIAMS:  Three witnesses they called to put

13  on that stand to talk about birth defect registry:  Dr. Oakley,

14  Dr. Moye, Dr. Blume.  Not a single one of them said anything

15  about where the data in any of those studies came from.  Not

16  one breath of any of it.  And I guarantee you if I am wrong

17  about that, your Honor, I'm not wrong about this:  Slovakia,

18  Japan, Mexico, Sweden, Spain.

19        MR. HENDERSON:  That's where Dr. Martinez-Frias' data

20  came from.

21        MR. MacWILLIAMS:  Germany, Hungary, Israel.

22        MR. HENDERSON:  I'll tell you what --

23        MR. MacWILLIAMS:  There is no foundation for any of

24  this.

25        MR. HENDERSON:  I'll be happy -- go ahead.

Deposition Designation Arguments

1              I will be happy to present to the Court the articles

2    that identify the different registries that are noted in the

3    articles that we've discussed, okay, that Dr. Blume discussed

4    and Dr. Moye discussed, and that we discussed with Dr. Jarvis.

5    I will be happy to identify those registries.

6              THE COURT:  If you can identify them and show that the

7    jury has already heard about data from these.  But if it's --

8    and I think it is like a lot of these objections.  I mean if it

9    relates to something that there is no other evidence of that it

10   produced any data, then that's out.

11             Does that give you enough guidance to make some edits?

12             MR. MacWILLIAMS:  I believe it does, your Honor.

13             THE COURT:  So I think that there is some probative

14   value to if it's a study that we have already heard showed

15   something in a registry, then to ask.  Because I think

16   everybody will agree Abbott couldn't bury its head in the sand.

17   But to just go through a bunch of registries that have -- you

18   know, that aren't connected to the case, then I don't think

19   that that is appropriate.

20             MR. MacWILLIAMS:  Next issue, your Honor, is Page 450,

21   Line 5.  And I'm sorry, your Honor.  I assumed you were ready

22   to move on.

23             THE COURT:  450.  Okay.

24             MR. MacWILLIAMS:  Recall, your Honor, Dr. Jarvis --

25   excuse me -- Dr. Embrescia is the pharmacovigilance witness.

1    Dr. Jarvis is the studies witness.

2        **"Q**   *To your knowledge, did Abbott implement, contribute*

3        *to, or otherwise participate in any international*

4        *collaborative studies to overcome the problems with*

5        *sample size, methodology, and birth defect definition*

6        *about the safety of Depakote in pregnancy?"*

7            There, again, I will say to your Honor, and I

8    apologize if I am repeating myself, the 30(b)(6) designations

9    have to mean something.  They mean, We put up Dr. Jarvis on

10   studies, and he talks about studies.  And they don't like the

11   answer they get from Dr. Jarvis, so we put up Dr. Embrescia on

12   pharmacovigilance, and they say, You know what?  I'm going to

13   make another run at that studies question I should have put to

14   Dr. Jarvis.

15           *THE COURT:*  Okay.  Mr. Henderson, how does this relate

16   to this?

17           *MR. HENDERSON:*  Subpoint 4 in the notice:  The

18   information known by or available to the company relating to

19   VPA drugs and birth defects, including any actions taken to

20   acquire, study, or analyze such data.

21           *THE COURT:*  Okay.  That objection is overruled.  That

22   will stay in.

23           *MR. MacWILLIAMS:*  Your Honor, next issue, Page 793.

24           *THE COURT:*  Okay.

25           *MR. MacWILLIAMS:*  This issue actually comes up

1    starting at 778, your Honor, I believe.  Let's see.  Yes.

2         So here's the background, your Honor.  In Abbott's

3    manufacturing plants, there are warnings, OSHA-type warnings,

4    signage of stuff on the drums of the API, the active

5    pharmaceutical ingredient for Depakote, that are required to

6    say "reproductive hazard!"  This line of questioning is, so you

7    told your employees -- you gave your employees a warning that

8    you didn't give the consumers of the drug.  Why didn't you have

9    "reproductive hazard!" in your label?

10         I struggle to count the different ways in which that

11   argument is irrelevant and prejudicial, the first of which is

12   nobody in this courtroom or who's been -- has set foot in this

13   courtroom on this case on either side thinks that the FDA would

14   have let Abbott put the words "reproductive hazard!" anywhere

15   in its label.  And they certainly don't get to ask Dr. Jarvis,

16   the pharmacovigilance witness, about that issue.

17         So the whole thread of, Why didn't you express to the

18   patients in the FDA approved and regulated product package

19   information insert the same language you used to warn your

20   plant workers in Puerto Rico?

21         *THE COURT:*  Okay.  Mr. Henderson.

22         *MR. HENDERSON:*  Two points, your Honor.  Number one,

23   it goes on notice that the company clearly knew there was this

24   reproductive hazard to certain people that were exposed.  It

25   also goes to the fact that the company knew this, and if they

1    are going to be aware that there is a reproductive hazard,

2    depending on populations that are exceeds, why didn't they do

3    something to pass that on to consumers who were ingesting the

4    product?

5            THE COURT:  Okay.  Well, we don't need to spend much

6    time on this.  I think if there is any relevance to this at

7    all, it is minimal.  And there is certainly a lot of 403

8    concerns here.  So all of that testimony will be excluded

9    because there is a great danger of unfair prejudice or

10   misleading the jury, confusing the issues.  What they warned in

11   the plants I see -- really, I don't see much probative value,

12   if any, and there's certainly a lot of concern there about the

13   jury being confused, or it being unfairly prejudicial.  So that

14   objection is sustained, and that testimony will not be read --

15   or not be played for the jury.

16           MR. HENDERSON:  Your Honor, just so I'm not looked at

17   harshly, that issue has been bounced around in mesh

18   litigation -- and I know this is not about mesh litigation --

19   but polyurethane and -- it all came in there.  That's the

20   reason we made the argument, but I certainly respect the --

21           THE COURT:  Yeah.  Yeah, we are not going to go there

22   in this case.

23           MR. HENDERSON:  All right.  Perfect.

24           MR. MacWILLIAMS:  Okay.  Your Honor, next issue,

25   Page 883, Line 20.

 1          MR. MacWILLIAMS:   The question put to Dr. Embrescia:

 2     **"Q**   *Does Abbott agree that its 1994 Depakote label*

 3     *indicates that Depakote has similar associations with*

 4     *birth defects as other antiepileptic drugs?*

 5          Two problems, your Honor:  I don't recall, as I stand

 6     before you, which Abbott witness or witnesses were the

 7     designated to speak to the meaning interpretation of the

 8     language in Abbott's labels, but it sure wasn't Dr. Embrescia.

 9     And, secondly, whoever it was, the jury has heard this theme

10     about 16 times so far.  It's becoming ridiculously cumulative,

11     and they shouldn't be able to layer it on from a witness who

12     was designated on pharmacovigilance.

13          If we have to put up a witness who is going to say

14     this is what the label says -- by the way, we can all read

15     it -- or this is what the label means, we'll do that and we did

16     it and they have that testimony.  That was not Dr. Embrescia.

17          *THE COURT:*  Okay.  Mr. Henderson.

18          *MR. HENDERSON:*  Judge, this is 16 or 18 lines of

19     testimony.  Point 5 in the notice is deliberations regarding

20     labeling or product use implications arising from

21     post-marketing surveillance.  This company works in divisions.

22     They intake it.  Dr. Embrescia is supposed to say, Hold on,

23     folks.  This has product labeling implications.  That's what

24     the notice says:  Deliberations regarding labeling or product

25     use complications arising from surveillance activities.

1          THE COURT:  Okay.  Give me a minute.  I want to read

2     it.

3          MR. MacWILLIAMS:  Your Honor, I would suggest that you

4     go to the next question, it starts at 884, Line 13.

5          THE COURT:  Yeah.  I've read through there.  I don't

6     see any relevance to this at all, and certainly not through

7     this witness.  So I'll sustain the objection to that line of

8     questioning that starts at 883, Line 20.

9          MR. MacWILLIAMS:  Your Honor, we can jump ahead from

10    there to -- and the page numbers recycle, so I apologize.  It's

11    in your same stack at Page 109, Line 22.

12         THE COURT:  Okay.  109.

13         MR. MacWILLIAMS:  Line 22.  So keep going behind the

14    700 series.

15         THE COURT:  Okay.

16         MR. MacWILLIAMS:  Question:

17    **"Q**  *Can you cite to any studies that you are aware of*

18        *using that term broadly that support the use of Depakote*

19        *as a first line anticonvulsant in women of childbearing*

20        *years?"*

21         He's the pharmacovigilance witness.  He's not an expert who

22    says what the studies mean.  Dr. Jarvis isn't even an expert

23    who says what the studies mean.  Dr. Jarvis was the designee

24    who was supposed to talk about the studies of which they were

25    aware.  Can you cite to any studies that support this theme of

1    plaintiffs' case.  Of course, he can't.  He's not that witness.

2         *THE COURT:*  Mr. Henderson.

3         *MR. HENDERSON:*  I read a while ago, your Honor, it is

4    about the company's knowledge and acquisition of data regarding

5    VPA drugs and birth defects.  And this gentlemen -- this

6    company marketed this drug as a first line drug.  We are not

7    asking him about marketing complications.  We are saying, You

8    are the chief of safety, you are the head guy about safety,

9    which includes a lot of medical literature.  That's how they

10   get information about adverse events.  That's one source.

11        And all we said was, Are you aware of any studies that

12   support the use of this drug as a first line therapy in women?

13        And he says no.

14        *MR. MacWILLIAMS:*  Why would anybody think that

15   Dr. Embrescia, the pharmacovigilance person whose job it is to

16   assess adverse event reports, would be aware of studies about

17   first line?  That's not his role.  It's not his designation.

18   They've gotten that from two or three other witnesses.  They

19   can't get it from Dr. Embrescia because he is not qualified and

20   wasn't designated for that purpose.

21        *MR. HENDERSON:*  I don't think we got that from other

22   witnesses.  If Mr. MacWilliams would point it out to me, I'd be

23   glad to look at it.  But this gentlemen was all about safety

24   data, including safety data from the medical literature.

25        *THE COURT:*  Okay.  Read to me the portion of his

Deposition Designation Arguments

1    designation again that you say covers this.

2        MR. HENDERSON:  "Information known by or available to

3    the company relating to VPA drugs and birth defects, including

4    any actions taken to acquire, study, or analyze such data or

5    information."

6        So this is information known.  I specifically asked

7    him, "Do you know of any studies that say Depakote is a

8    first-line anticonvulsant?"  That's information known by the

9    company regarding VPA drugs and birth defects.

10       MR. MacWILLIAMS:  The first line.  I'm sorry, your

11   Honor.

12       THE COURT:  It seems like -- I mean there is no

13   limitation to time frame on this either.

14       MR. HENDERSON:  Yeah.  Well, your Honor, this

15   deposition started out with the rigmarole about what time frame

16   that the deposition covers because we had this -- proving to

17   now to be an awkward split in the data, so it wasn't in every

18   question.

19       MR. MacWILLIAMS:  Your Honor, that category that

20   designation that he just read to you, that has nothing to do

21   with first-line anticonvulsant.  That's a term of art that the

22   plaintiffs have injected into this case.  It has nothing to do

23   with adverse events.

24       THE COURT:  I agree.  I'm going to sustain that

25   objection.  I think it has come in through other witnesses, and

1    I don't see that it's appropriate for this witness to be

2    testifying to it.  So that will be sustained.  What is the next

3    objection?

4         MR. MacWILLIAMS:  This is the part at which I get a

5    little hazy on what is in and what is out, so maybe you can

6    help me with this.  Page 53, Line 3 of...

7         MR. HENDERSON:  You are going to the next.

8         MR. MacWILLIAMS:  The next one, 1211, 2014.

9         THE COURT:  Okay.

10        MR. MacWILLIAMS:  Line 3.  I think I now understand

11   that that is text that's stricken through.

12        MR. HENDERSON:  That's gone.

13        THE COURT:  Yeah.  That's out of mine.

14        MR. MacWILLIAMS:  Okay.  Thank you, your Honor.  That

15   was the easiest way.  Okay.  Is that also true for Page 83,

16   Line 3, or is that in yours, your Honor?

17        THE COURT:  83, Line 3 is in mine.

18        MR. MacWILLIAMS:  So the question put to

19   Dr. Embrescia:

20        "Does Abbott agree that the purpose of the pregnancy

21   warning language in the Depakote label is to protect women who

22   may have children while using Depakote?"

23        "Objection, foundation, form, and scope"

24        Because Dr. Embrescia is the pharmacovigilance

25   witness, not the witness on what is the purpose of the warning

Deposition Designation Arguments

1    label.

2         *MR. HENDERSON:*  Your Honor, it would have been nice if

3    we would have had one witness that could have started at

4    intake, gone through the analysis process, and then

5    communicated with the FDA.  That's not how pharmaceutical

6    companies operate.  That's why our notice said, Deliberations

7    regarding labeling or product use implications arising from

8    post-marketing safety surveillance.

9         This gentleman has to know that when information comes

10   in to his department, if it has labeling implications, he has

11   to know what the purpose of the labeling is.  And if data comes

12   in that has implications for the labeling, it is his job to act

13   upon it.  That's what the question goes to.

14        *MR. MacWILLIAMS:*  "Does Abbott agree that the purpose

15   of the pregnancy warning language is."

16        *THE COURT:*  Well, is there anybody who wouldn't agree

17   with that?  I mean...

18        *MR. MacWILLIAMS:*  That's --

19        *THE COURT:*  I'm just having a problem seeing the

20   relevance.

21        *MR. MacWILLIAMS:*  I hear you, your Honor.  But you

22   know it's a pedantic world in which we live, and I say the same

23   to them.  Why are you bothering?

24        *MR. HENDERSON:*  Well, you know, we took a witness that

25   was deposed for four days, and I don't even know how many

Deposition Designation Arguments

1    hours, but it was a lot.  And we got down to 15 pages here.  It

2    is nice having the head of safety from Abbott acknowledge that,

3    yes, our label is designed and supposed to protect women.  My

4    department is the safety department, and I acknowledge that.

5             *THE COURT:*  Okay.  I will overrule that objection.  I

6    think the statement is pretty harmless but...

7             *MR. HENDERSON:*  Is it?

8             *MR. MacWILLIAMS:*  Oh, Mr. Henderson, come on now.

9             *MR. HENDERSON:*  I think that's the end of our offer.

10            *THE COURT:*  That's.

11            *MR. MacWILLIAMS:*  Is this out?

12            *THE COURT:*  I have 252.

13            *MR. HENDERSON:*  What is that?  From Embrescia?

14            *MR. MacWILLIAMS:*  Yeah.

15            *MR. HENDERSON:*  Oh, yeah.  That's --

16            *MR. MacWILLIAMS:*  That's out.

17                          *(Conferring)*

18            *MR. MacWILLIAMS:*  Just a moment.

19            *MR. HENDERSON:*  It may not seem like it to your Honor,

20    but --

21            *MR. MacWILLIAMS:*  Is that --

22            *MR. HENDERSON:*  -- we cut a lot.

23            *MR. MacWILLIAMS:*  Is there a 235 03?

24            *THE COURT:*  No.  Mine ends at Page 252.

25            *MR. MacWILLIAMS:*  So I'm asking about 235.

Deposition Designation Arguments

1          *MR. HENDERSON:*  It goes from 83 to 252.

2          *THE COURT:*  Yeah.  Mine goes from 83 to 252.

3          *MR. MacWILLIAMS:*  Okay.  They appear to have taken

4    Mr. Rosemond's favorite document in the whole world out of

5    this.

6          *MR. HENDERSON:*  You will hear about it later.

7          *THE COURT:*  Well, I appreciate cutting it down.  And I

8    understand.  I mean I am somewhat frustrated, but I understand

9    a lot of this comes from preparing multiple cases.

10          *MR. HENDERSON:*  Let me tell you something else, your

11    Honor, not to be dealt with now.  But in light of all these

12    rulings and whatnot, we appreciate the guidance.  We may have

13    to go back and seek some discovery to do it within --

14    consistent with the Court's rulings and, you know, for future

15    uses, but we will deal with that down the road.

16          *THE COURT:*  Oh.  I was, like, you don't mean during

17    trial.  You were scaring me there for a minute.

18          *MR. HENDERSON:*  In our spare time we will take some

19    depositions between 3:00 a.m. and 6:00 a.m.

20          *THE COURT:*  Yeah.  Okay.

21          *MR. MacWILLIAMS:*  You are sleeping from 3:00 to 6:00?

22          *THE COURT:*  I think Mr. Cueto could do that.  Okay.  I

23    was offering you to take depositions at 2:00 in the morning.

24          *MR. CUETO:*  Pardon me?

25          *THE COURT:*  I was offering you to take depositions.

Deposition Designation Arguments

 1             *MR. MacWILLIAMS:*  Mr. Cueto.

 2             *MR. CUETO:*  Oh, oh, okay.  Are you are mad at me?

 3             *THE COURT:*  I'm sure there's 5 minutes and 40 seconds

 4    to argue about.

 5                  *(An off-the-record discussion was had)*

 6             *THE COURT:*  Okay.  So who are we on now?

 7             *MR. CUETO:*  Your Honor, Jeff Baker; Dr. Jeff Baker.

 8             *THE COURT:*  Dr. Jeff Baker.

 9             *MR. BALL:*  I got it.  I got it.  One objection.  And

10    it will cover the whole deposition.

11             *THE COURT:*  Okay.  Who is Dr. Jeff Baker?

12             *MR. CUETO:*  He's a PhD clinical psychologist, Judge.

13             *MR. BALL:*  This is on --

14             *THE COURT:*  Is he an...

15             *MR. BALL:*  Abbott employee.

16             *THE COURT:*  Abbott employee, okay.

17             *MR. BALL:*  So, you know, your Honor we have been -- we

18    have been all through the post-1999 medical literature.  That's

19    what this is about.  And we have honored your Honor's rulings

20    that if it's post-1999 and its being relied upon by an expert

21    or something, we have made objections for the record, but we

22    haven't reargued or anything like that.  And if it comes in for

23    causation or that type of thing.  All right.  So this is a

24    person taken -- remembering how all these depositions were

25    taken in a broad range of cases, this is a PowerPoint

1   presentation by Dr. Meador in 2006.

2          THE COURT:  Okay.

3          MR. BALL:  About cognitive data relating to Depakote.

4   And some of this Meador data was referenced yesterday when John

5   was doing Dr. Lammer's deposition.  There were three or four of

6   his papers that were referenced, and we honored your Honor's

7   rulings on that.  But this should not -- there should not be

8   questions about this from a company witness about 2006 data

9   when it is not being related to any expert testimony.  So

10  that's it.  Okay.

11         THE COURT:  Mr. Cueto.

12         MR. CUETO:  Your Honor, apparently there was data that

13  was present at an expert advisory panel that was convened by

14  Abbott.  And so we were just asking questions about the data

15  that Abbott was presenting at this expert advisory panel that

16  includes this data, Judge.  It is relevant.  It goes to

17  causation.  And we are not producing the slide -- I'm sorry,

18  what we are producing is the slides -- we are questioning the

19  witness.  We are not offering the exhibit actually for

20  admission.  But we are questioning the witness about slides

21  that the witness apparently saw when he was in an advisory

22  panel that Abbott had apparently convened, the way I read these

23  questions and answers.

24         MR. BALL:  In 2006.  So in a 2006 or so case this

25  would be relevant.  But under the rules that you have

1    established here, the post-1999 data -- this data was not

2    available before 1999.  Under the post-1999 data rule that you

3    have established if it can be relied upon by an expert -- and

4    that's what we have been doing this entire trial about -- but

5    then to have them now come in with an Abbott employee and say

6    wasn't this presented in 1996 it -- excuse me.

7         THE COURT:  2006.

8         MR. BALL:  It can't be notice for God's sake.  So we

9    have honored the rule, and we just ask that we stick to the

10   rule.

11        THE COURT:  Well, we will.  I'll sustain that

12   objection.

13        Because I let the post-1999 literature come in that

14   the experts with rely upon it for causation and for plaintiffs'

15   argument that what they would have known if additional research

16   had been done.

17        So I don't see the relevance of questioning an Abbott

18   witness about something that was done in 2006.

19        So that would be sustained I'm sorry you lost your

20   first appearance, Mr. Cueto.

21        MR. CUETO:  Eventually all this out-of-town talent is

22   going to have to leave and Mr. Ball will come back.

23        MR. BALL:  Maybe you will be like Tony LaRusa and that

24   will be your only at-bat.

25        MR. CUETO:  I'll be back.

1          THE COURT:  Next.

2          MR. SAMPSON:  May I bring something up to break up the

3    deposition issue.  We have and there's no objection yet to an

4    amended life care plan that we have based on Dr. Henderson

5    testimony today about oral surgery.  But I wanted to bring up

6    that the life care planner intends to talk about future costs

7    of surgery-related and therapy-related things in connection

8    with that oral surgery.

9          MR. BALL:  That's the one -- we have got this or not?

10         MR. SAMPSON:  You have it.

11         MR. BALL:  We are studying it.  We got it last night

12   maybe something like that.

13         MR. SAMPSON:  You got it as soon as we got it, based

14   on the fact that we got Dr. Henderson.

15         THE COURT:  When you are saying "we got it" you are

16   talking about a supplemental life.

17         MR. SAMPSON:  Supplemental life care plan.  That only

18   adds two things.  It adds costs and connection with the oral

19   surgery that Dr. Henderson has talked about and blessed the

20   reasonableness of.

21              And then, secondly, this goes to that MACE procedure

22   that your Honor has already ruled on not in connection with

23   with any failures or problems or not going to work type

24   testimony.  But there are certain routine maintenance things

25   that go along with MACE that Dr. Lott would talk about.  Not in

1    the context of this thing is going to fail, it is not going to

2    work.  But you have to get new tubes every so often.  You have

3    to do this that and the other as routine maintenance of this

4    MACE procedure and the life care planner put the cost on that

5    as well.  So I wanted to bring up.

6              THE COURT:  Are you prepared to talk about this,

7    Mr. Ball?

8              MR. BALL:  Kinda.

9              We got this and our preliminary analysis is that its

10   406 to $506,000 of new damages, okay.  Some of it we are not

11   going to have a problem with.  Some of it I'm not sure.  So

12   just give me a little bit okay.  Brennan is not going to be

13   until Friday and we will let somebody know.  I will let you

14   know.

15             THE COURT:  What is this witness's name?

16             MR. BALL:  Brennan and he is a.

17             MR. SAMPSON:  Buddy Brennan.

18             MR. BALL:  So what he does is the doctors say this is

19   what the plaintiff's going to need in the future.  He calls up

20   and figures out how much that is going to cost, and puts it all

21   on.

22             THE COURT:  I've already ruled that Dr. Henderson that

23   that supplemental report was okay because he had said, you

24   know:  I found it to be supplemental.  And that's fine.  But

25   take a look at it and if we have anything to argue about we

1    will.

2              *MR. BALL:*  We will and we are working on it.

3              *MR. SAMPSON:*  The one other aspect of it, and this

4    goes to Dr. Lott who will testify tomorrow, I just want to make

5    sure it's okay that he talks about what the routine kind of

6    maintenance and upkeep of this MACE product is.  Not that its

7    I'm going to fail or what the percentages of failure.

8              *THE COURT:*  I will allowed limited --

9              *MR. SAMPSON:*  Limited, yes.

10             *the cort:*  -- testimony about routine care.

11             *MR. BALL:*  Care.  What it is like he is going to

12   need --

13             *MR. SAMPSON:*  New tubes.

14             *MR. BALL:*  New catheters.

15             *MR. SAMPSON:*  New catheters and things like that.

16             *MR. BALL:*  Understood.

17             *THE COURT:*  Okay.

18             Okay.  What's next.

19             *MR. MacWILLIAMS:*  Can we take a quick diversion, your

20   Honor.  The plaintiffs when I referred to this favorite

21   Rosemont document, they said we will hear about it again.  And

22   since we are here it seems like we ought to talk about it now

23   because it is going to be an issue whenever it comes up and I

24   mean not sure.

25             *THE COURT:*  What is this document?

1          *MR. MacWILLIAMS:*  Your Honor, this is a document

2     produced by Abbott, and it has at the top of it "Neurology

3     consultant meeting June 2nd 2001."  Nobody knows, your Honor,

4     where this came from.  I will direct your attention to on the

5     second page, Page 729.2.

6          *MR. HENDERSON:*  Beg your pardon.

7                    *(Attorneys confereing)*

8          *MR. MacWILLIAMS:*  I'm wasting your time again.

9          *MR. BOUNDAS:*  We do know where it came from, but we

10    are not trying to get it in.

11         *MR. MacWILLIAMS:*  It is Mr. Henderson steering me down

12    the primrose path.

13         *MR. HENDERSON:*  I told him we would hear about it

14    again, meaning in the universal since.

15         *MR. MacWILLIAMS:*  Mrs. Spath, your Honor, Cheri Spath.

16         *MR. BOUNDAS:*  You know, on this one, Michael, I might

17    save you some time.  I took a huge cut and got it down to five

18    minutes.

19         *MR. MacWILLIAMS:*  What are the five minutes.

20                    *(Attorneys conferring)*

21         *MR. BOUNDAS:*  And I could talk about Muraoka right now

22    and that might save some time.

23         *MR. MacWILLIAMS:*  Let me look at this real quick.

24         *THE COURT:*  Go ahead.

25         *MR. MacWILLIAMS:*  So, your Honor, I gratefully and

1    humbly acknowledge Mr. Boundas' effort to cut this down.  Let

2    me give you two minutes of background.

3            THE COURT:  Who is this.

4            MR. MacWILLIAMS:  Poor Cheri Spath was the first

5    witness deposed in this litigation to my recollection.  I

6    defended, Mr. Williams took her deposition.  She is in medical

7    information.  She sits in a, perhaps a small office or cubicle

8    in north Chicago, Illinois in Abbott Park.  And she responds to

9    requests for information lodged by doctors, or patients, or

10   sometimes salespeople.

11           So when outsiders, people outside the walls in Abbott

12   Park, want information about Depakote and they call an 800

13   number -- for example, a toll free number on the label -- they

14   get directed to medical information.  The medical information

15   people just like other folks in this enterprise, are limited to

16   what is in the labeling.  So Mrs. Spath if she gets a question

17   from a patient, all she can say is:  I can't send you the

18   label; or, I can refer you back to your prescribing physician.

19           If she gets a question from a doctor there are other

20   resources she can direct them to.  So, for example, she can

21   direct them to literature that has been approved by Abbott's, I

22   don't know what they call it, but its pharmacolegal, the people

23   who bless this information is acceptable to distribute to

24   health care professionals.

25           THE COURT:  She directs them to another department or

1    she actually directs them to the literature?

2         *MR. MacWILLIAMS:*  She has some things called standard

3    responses so they have a number of topics that are covered

4    preapproved this is what I can send you on Depakote and

5    hepatotoxicity.  They had one on Depakote and pregnancy.  And I

6    will concede that they had one on Depakote and pregnancy.  And

7    if it had ever been shown to anybody germane to this case, it

8    would be relevant and this testimony would come in.  There

9    isn't any testimony that any doctor or any patient called and

10   asked Abbott, not Dr. Taber, not Dr. McGonagle, not

11   Dr. Ralston, not Mrs. Kaleta or Mr. Kaleta or anybody else

12   whose name has been mentioned in these four walls, asked

13   anything of Abbott's medical information department.

14        There is nothing to suggest that information that came

15   out of Abbott's medical information department ever had an

16   impact on anybody's understanding of the proper prescription

17   practices with respect to Depakote as it relates to Mary

18   Kaleta.  So there's just no foundation for bringing the

19   documents in or even that Abbott's got this group frankly in

20   this case because all its going to be is:  Here's your

21   testimony that suggests that Abbott had this standard response

22   for pregnancy considerations.  And the jury's going to be

23   wondering, Huh, wonder what that was about?  Wonder who it goes

24   to?  Wonder who heard it?  Why is it different from the label?

25        All of those things are just designed to engender

1  confusion.  That's the only fact -- practical effect they can

2  have.  And there is no connection to this case because no

3  doctor and nobody with the last name Kaleta ever asked about

4  it.

5        MR. BOUNDAS:  Your Honor, I think this is real simple

6  point.  The point is, so the jury will be educated, that

7  Abbott's corporate communication of risks of this product,

8  which is part of what medical information does, is that the

9  only information Abbott would communicate to doctors, patients,

10 physicians, the public, is what's contained in the label.  They

11 would -- there is no other -- so the jury understands, it is

12 not as if there is some other way that Abbott is getting

13 information out to people.  So the jury might wonder, Is Abbott

14 could -- could people get more information than what's in the

15 label?  And she confirms that, no, you know, we are -- the only

16 thing we ever sent out was what's in the label.

17       So I think it is a way to clarify for the jury there

18 is no other source of information that is getting to doctors or

19 patients.  And that's really the point.

20       MR. MacWILLIAMS:  I neglected to point out, your

21 Honor, Mrs. Spath was deposed in her individual capacity.  She

22 is not an officer or director-level person.  She doesn't speak

23 for Abbott and she made that point a number of times.  And if

24 the question is:  Can Abbott get Depakote related information

25 outside the label, out to whomever, that was a perfect subject

1    for Dr. Blume; she presumably could speak to that.  But to just

2    call some -- poor Cheri Spath.  Who, you just:  Why am I here

3    and how did I get here?

4              THE COURT:  That's what I'm saying.

5              MR. MacWILLIAMS:  Right.

6              And ask her questions about, do you, you know, what do

7    you tell a random doctor or salesperson or somebody else

8    unrelated to this case, what information can you give them?

9    She doesn't speak for Abbott on that.  She is just speaking for

10   Cheri Spath, and that's not a proper use of this information.

11   It's drawing too much.

12             THE COURT:  Mr. Williams.

13             MR. WILLIAMS:  If I may, your Honor.  First of all, we

14   are not trying to confuse people we are trying to clear some

15   things up.  The evience is pretty clear that there is a

16   presumption a lot of people have that, gosh, I could call and

17   find out more about this.  It is Abbott's policy -- and that's

18   what she speaks to.  It's Abbott's policy that although they --

19   that we will not give to a patient anything beyond the label.

20   That's their policy.  That's what this is for.  And when he

21   says she speaks for herself; well, they're the ones that -- I

22   mean, she works for them and she has personal knowledge.

23   That -- that is their policy, that nobody could ever get

24   anything -- no patient could ever get more than what's in the

25   label.  And I think that's relevant because that's their

1    policy.

2           It's not -- they didn't say, well, that's the law and

3    we are restricted to do that.  To the contrary that's their

4    policy.  And we've talked about in this case women of

5    childbearing potential wanting to, you know, know what it is

6    and we think that they should not have gone into that.

7           What we intend to prove is anybody who would have

8    asked for additional information a sole source of information

9    from Abbott is the label.  And that's what this is about.

10          And I think -- and they've not shown any prejudice.

11   There's no prejudice in this.

12          MR. MacWILLIAMS:  Your Honor, we think it is actually

13   probative of their -- this is by design to limit you --

14   everybody's information to one thing the label.  And that's

15   their plan.

16          THE COURT:  And I haven't seen the deposition.  So

17   that's what she says is if someone calls this is what.

18          MR. MacWILLIAMS:  Because by law that's all she is

19   allowed to do.

20          MR. WILLIAMS:  Show me.  Show me.

21          MR. MacWILLIAMS:  He says it is their policy.  It is

22   because we can't talk to patients about stuff outside the

23   label.  What kind of train wreck trials would we have if we

24   were allowed to go to patients and say, don't mind that label

25   here's the real story.

```
 1            And that's the very nefarious way in which -- they ask

 2   the questions in the way I don't know if it was designed at the

 3   time.  But as experted out here:  The only thing you ever tell

 4   them is what's in the label, right?  That's what you are

 5   limited to.

 6            Of course.  Abbott has no opportunity to reach out to

 7   patients, even if patients call them, and give them information

 8   outside the label.  The FDA would have our heads.

 9            MR. WILLIAMS:  I'm sorry, I hear him say that.  If he

10   can reference me to a CFR that says that, but that assertion I

11   cannot agree with.

12            MR. MacWILLIAMS:  I --

13            THE COURT:  I'm going to overrule the objection at

14   this time because I think there is some relevance to it.  And I

15   think that you know the jury has heard already some evidence

16   about the patient making the ultimate decision.  I mean, that's

17   come up a couple of times about it.  And if they might be

18   thinking, well, maybe Mary Kaleta should have called and gotten

19   some more information.  And this is going to explain to them,

20   as Mr. Williams says, I haven't looked at it but that that's

21   all that would have been given was what was in the label that's

22   what you are telling me is the relevance, correct.  Then I can

23   see that that is relevant.  So.

24            MR. MacWILLIAMS:  Your Honor, there is not going to be

25   any testimony from Mary Kaleta that she called Abbott and
```

1   asked.

2          *THE COURT:*  I know.  But I think it could.

3          *MR. MacWILLIAMS:*  Or that it ever occurred to her or

4   any of that.

5          *THE COURT:*  But I think it does have some probative

6   value and I don't see that there is any danger in confusing the

7   jury.

8          *MR. MacWILLIAMS:*  Thank you, your Honor.

9          *COURT REPORTER:*  Judge, I need just a second.

10         *THE COURT:*  We will take a break and let Molly get her

11  computer going.

12                          *(Recess)*

13         *THE COURT:*  Okay.  What's next?

14         *MR. SAMPSON:*  Your Honor, would you be willing to take

15  up what ought to be, hopefully, a quick discussion about

16  plaintiffs' desire to read into evidence some discovery

17  responses?

18         *THE COURT:*  Okay.

19         *MR. BALL:*  Do you have a copy for her, the Judge?

20         *MR. NOVOSAD:*  I'm getting a full set made.  It is what

21  we filed.  There's a couple of pages that are being changed

22  out.  We -- we come to some agreements I think and --

23         *THE COURT:*  Okay.

24         *MR. NOVOSAD:*  -- swapped a couple of things in and

25  out.

Deposition Designation Arguments

1          *MR. MacWILLIAMS:*  Heath, how are those voices?

2          *MR. NOVOSAD:*  The voices in my head are good.

3          Molly, thank you for the transcript read so nicely

4     yesterday.  You -- you left the laughter by everyone off, which

5     I am now putting on.

6          *MR. BALL:*  How do you want to proceed?  Do you want to

7     show her?

8          *MR. NOVOSAD:*  We can start with -- yes, it's 11, 12,

9     and 13 are out.  We can start with these.

10          If I could approach, your Honor.

11          *THE COURT:*  Sure.

12          *MR. NOVOSAD:*  So the very first one, Mr. Ball, is

13     number three but if one of these comes in, we need three.  If

14     all three of these are out, we don't.  So I think arguing

15     over -- three is the predicate so all three of these refer to

16     it.

17          *MR. BALL:*  So what do I do?

18          *MR. NOVOSAD:*  So do you have any objection to 176,

19     185, and 187?

20          *MR. BALL:*  So here's what I don't understand and that

21     is they've got a whole list of different Depakote products, you

22     know, capsule, and capsule delayed, and capsule extended, and

23     injectable.  I don't understand how that -- I feel like if I

24     agree to this, that then I'm missing something here because it

25     is not important to the case.  If they had just said in

 1   Number 176 admit that all times since their instruction to the

 2   market Abbott marketed whatever this product is called,

 3   Depakote -- whichever one of these applies to --

 4          THE COURT:  So the thing that you just read from,

 5   that's Number 3?

 6          MR. BALL:  Yep.

 7          MR. NOVOSAD:  And it's -- I'm getting a copy printed

 8   for your Honor.  And I think Mary was on multiple -- if you

 9   look at these, these are Depakote.  One is 125 milligrams, one

10   is 250, there is some five hundreds.  She is on a multiple of

11   these.  This was an effort to -- these are the Depakote

12   products that were on the market and which -- the purpose of

13   three was to get you guys to admit these are our products.

14          MR. BALL:  Right.  Which we did.

15          MR. NOVOSAD:  You did.  And so it is did you market

16   these products.

17          MR. BALL:  Why don't you just take the ones that she

18   was on and we will agree we marketed them?  That's it.  I don't

19   want to get into injectables and all this other stuff.

20          MR. NOVOSAD:  So you want me to send a new request for

21   admission tonight --

22          MR. BALL:  No, no, no.

23          MR. NOVOSAD:  -- that you will respond to by tomorrow?

24          THE COURT:  We could do a stipulation, correct?

25          MR. NOVOSAD:  Okay.

```
 1              THE COURT:  Okay.  Let's do a stipulation anything

 2    that she was on.

 3              MR. BALL:  Yeah.

 4              THE COURT:  I mean I can see we don't went to be like,

 5    well, she wasn't on that one.  So...

 6              MR. BALL:  Yeah.  So 185 is the same -- .

 7              MR. NOVOSAD:  Same thing for the next two.

 8              MR. BALL:  -- same deal.

 9              And yeah.  Okay?

10              MR. NOVOSAD:  Okay.  We'll work on the language, get

11    that to you tonight.

12              MR. BALL:  Okay.  So that takes care of -- what's the

13    next one, Heath?

14              MR. NOVOSAD:  That's 185 and 187.  So we move on to

15    24.

16              MR. BALL:  Yeah.  Okay.  All right.  Do you have that

17    one for the judge?

18              MR. NOVOSAD:  I have your full response.  Not the part

19    we intend to read in.

20              MR. BALL:  Do you want me to just hand it up to you?

21              THE WITNESS:  Sure.

22              MR. BALL:  It has my scribbling on it but you won't be

23    able to figure it out.  See if I can do this from memory.

24              Can I look over your shoulder for a second, Heath?

25              MR. NOVOSAD:  Yeah.
```

Deposition Designation Arguments

```
 1            MR. BALL:  So our objection here, your Honor, is these
 2    were filed -- this is essentially a quote or a paraphrase from
 3    our new label, present day label.  Okay?  And the reason they
 4    have the four times pregnancy registry data, blah, blah, blah
 5    shows four times higher than the rates to mothers using other
 6    antiseizure monotherapies.  Okay?  The pregnancy registries
 7    started, as we have heard, late '90s, went well into the 2000s.
 8    Some of the other medications that are referred to weren't even
 9    on the market in 1999.  I feel like I'm repeating myself here
10    but we object to the relevance of this.  This is a backhanded
11    attempt to put the new label into the case.  And this is a
12    backhanded way of getting in registry data.  Again, the rule
13    was that if we're going to get into data that postdates '99,
14    scientific data, it is going to be done through an expert
15    relying upon it so that -- and that's the only way it is going
16    to come in and so we object to this as irrelevant, unfairly
17    prejudicial to the circumstances in this case.
18            MR. NOVOSAD:  Your Honor, we've discussed this next
19    series.  24, 27, 29, 30, 34, and 35 were all subject to a
20    hearing we had with Judge Williams in 2013, in June.  And I
21    have a copy of the order from that hearing, if I could
22    approach.
23            THE COURT:  Okay.
24            MR. NOVOSAD:  I gave a copy of this to Mr. Ball
25    earlier.
```

```
 1            And if -- on the bottom of Page 2 is where we start.

 2   Abbott objects to requests to admit 15 through 38 on the basis

 3   of the general definition of the time period.  The Court finds

 4   these ask for information about Abbott's knowledge on the date

 5   of the admission and address issues of causation.  Any

 6   admissions would be construed as based on current knowledge and

 7   the Court would be willing to instruct a jury accordingly.

 8            And then a couple lines down Abbott must admit or deny

 9   the request to admit.  To the extent Abbott qualifies an

10   admission or denial, the Court will later address the

11   admissibility of the qualifying language and/or take up

12   requests on instructing the jury accordingly.

13            And I think that on each of these I believe there

14   is --

15            MR. BALL:  Take them one at a time take because I

16   don't have objections to all of them.

17            MR. NOVOSAD:  Okay.

18            MR. BALL:  So take them one at a time.

19            MR. NOVOSAD:  Starting with 24, they have qualifying

20   language.  We are okay with that qualifying language being read

21   into the record.  And it is -- while these are statements from

22   the then current label, 2013, not one of them references the

23   label.  It is -- goes to causation and here it's a -- it is a

24   factual statement.  Our position has always been that, you

25   know, this is referring to a registry but it is a factual
```

1    statement.  And Abbott admits that it contains a correct

2    description of a registry as of one point in time and is

3    subject to the limitations of such data.  This is a limited

4    response.  It is a limited admission.  We didn't bring that

5    back up with Judge Williams and we are okay with their

6    qualified statement being part of the -- the answer read to the

7    jury.

8         *MR. BALL:*  Judge Williams, if he said it once, he said

9    it umpteen times that he was dealing with discovery and what

10   would happen at trial would be decided later on.  And we -- you

11   have set the ground rules on post-1999 data.  The pregnancy

12   registry data they're setting forth here, none of it was

13   published before 1999, zero of it.  And this is a backdoor

14   attempt to get around the ruling that's been in force for

15   however many days we've been in trial here about how post-'99

16   data is going to be handled.

17        And just like the thing we argued a minute ago with

18   Chris Cueto, this is the same principle here that -- it was the

19   same principle.  This -- this is the new label that's been

20   ruled out and it's post-'99 data, which has been said can only

21   come in with a proper foundation through an expert.  If they

22   would have tried to put this in through an expert, we would

23   have had a discussion about it because the four times language

24   comes -- wasn't even available in '99.  And so it is just not

25   appropriate.

 1          It is irrelevant and unfairly prejudicial to put this

 2   in for all the reasons I've discussed.

 3          THE COURT:  Well, that's my concern.  If this is the

 4   language from the label, although with the qualification I'm

 5   not sure that -- what's really being admitted anyway.

 6          MR. BALL:  Well, at one point in time, I mean if we --

 7   if I had it to do all over, we would have said at a specific

 8   point in time.  But there wasn't a point in time that that --

 9   that piece of data became -- we couldn't say as of April 1st

10   2006.  Okay?  There -- it was accumulating over a period of

11   time and eventually that was the conclusion that was reached.

12          MR. NOVOSAD:  But it was --

13          MR. BALL:  And certainly that conclusion was certainly

14   reached after 1999.

15          MR. NOVOSAD:  I think to --

16          MR. BALL:  I mean we just can't lose track of what's

17   happening here is that the new label has been ruled out and yet

18   this is a quote from the new label.

19          MR. NOVOSAD:  That doesn't reference -- it is a quote

20   from the new label but does that make it is an -- is this,

21   without referencing the label, an inaccurate or factually

22   incorrect statement.  This is a true statement of fact.  Just

23   because -- just because it is in the label doesn't mean it is

24   inadmissible.  I mean there are statements in the label that

25   are admissible.  And just because it exists there that does

1   not, in and of itself, make everything that is said in the new

2   label inadmissible.

3        MR. BALL:  It is a true statement of fact that was not

4   known or knowable in 1999 because of -- the pregnancy registry

5   wasn't completed and the four times greater than other drugs,

6   some of which weren't even on the market, was not known.  So it

7   is a statement from the label, it is a true statement of fact

8   in 2015 or '14, but it was not a true statement in 1999.  And

9   this is an end run around all the Court's rulings for two

10  weeks.

11       THE COURT:  Well, my concern with the label was just

12  if the jury sees the label, they might be done because they see

13  the current label.

14       MR. BALL:  Well, if they see a request from admission

15  flashed up on that screen during closing argument might be

16  done.  If they see this put up in there.

17       If this is going to be allowed in in this case, then

18  we request some permission to clarify this one point in time

19  statement --

20       MR. NOVOSAD:  Your Honor --

21       MR. BALL:  -- to say that it was, you know, after 1999

22  at least.

23       MR. NOVOSAD:  Your Honor, they had every opportunity

24  and Judge Williams invited them if an admission or denial

25  subsequently needs changing due to the evolution of scientific

1    knowledge, the proper means to address this is to file a motion

2    with the Court.  This answer has been on file, publicly on file

3    since 2013 and there's been no motion to change it.

4              If I may approach, I do have a spare copy now for your

5    Honor.

6              MR. BALL:  And, you know, he said -- he also said any

7    admissions would be construed as based on current knowledge.

8    That's what Judge Williams's order says, based on current

9    knowledge.  So that's what we were basing it on is current

10   knowledge.  This is, oh, boy, this is really unfairly

11   prejudicial.

12             THE COURT:  Well, that's my -- that's my concern with

13   this is that there is no time limitation on this at all.  I

14   mean the rate of congenital malformation among babies born to

15   mothers using valproate is about four times higher than the

16   rate among babies born to epileptic mothers using other

17   antiseizure monotherapies.

18             MR. NOVOSAD:  Again, it goes to causation.  They're

19   contesting causation in this case and that's one of the things

20   that it is relevant to.  And, again, this is their answer that

21   they answered it this way.  They -- they did not put in at what

22   point in time they answered this.  And they've never moved to

23   try to amend this answer.  Again, it's been on file for 18

24   months.

25             MR. WILLIAMS:  It is a true statement.

Deposition Designation Arguments

1          MR. BALL:  This does not go to causation.  It's at the

2     four times is the comparative risk, which is what their case is

3     all about.  Okay?  That's what their case is all about.  And

4     I've been shut down.  I was shut down yesterday by Mr. Boundas

5     about not getting into general causation on things and that's

6     what we've abided by.  So even though that's not what I'm

7     trying to do, that was what came up.

8          We just cannot open the door on new label and

9     information from Abbott.  The case will be over.  If this -- if

10    this kind of thing gets in there we might as well...

11         MR. WILLIAMS:  Well, it is the truth.  So we start

12    with that basis.

13         MR. BALL:  It is the truth today.

14         MR. WILLIAMS:  It is the truth today.

15         MR. BALL:  According to Abbott's label.

16         MR. WILLIAMS:  And if I may, your Honor --

17         MR. NOVOSAD:  Well, according to the registry.

18         MR. WILLIAMS:  If I may, valproic acid, its

19    teratogenicity today is the same as it was in 1978.  It had

20    that same harm.  It -- its -- they've not changed the chemical

21    structure of valproic acid.  It is the same chemical structure

22    today as it was many years ago.

23         So we took -- you know, we relied on this, that this

24    is an important thing to -- this is the truth.  And we all

25    agree it is the truth.  And I don't understand the -- why we

1    should -- what legal objection would limit us from using a --

2    an admission that we all agree is true and it is an admission

3    by Abbott.

4            MR. BALL:  Okay.  I think I can help.

5            MR. WILLIAMS:  And so --

6            MR. BALL:  I'm sorry.  I thought were you done.

7            MR. WILLIAMS:  I mean it's -- that's where we start

8    out.  Put the label aside.  That's why we did it that way, to

9    avoid the label.  And, you know, your Honor we went through

10   dozens and dozens and dozens of hearings fighting over things.

11   Arguing over things in front of Judge Williams and here's what

12   we end up with.

13           And we have an dismission -- and we think it is

14   relevant that it is four times worse than the other AEDs.  And

15   that's just a fact that we should be able to use in this case.

16   I mean why should we hide that fact from the jury?

17           MR. BALL:  Okay.

18           MR. WILLIAMS:  It is four times worse.

19           MR. BALL:  I think I can help resolve this if you will

20   look at 25 and 27, which are the next two.

21           We admit 25.  And we admit 26 with a statement -- and

22   we are -- and those don't have the four times language in it

23   and it they don't have the same kinds of concerns that we have

24   in the one we are talking about.  Those are general causation

25   types of admissions.

Deposition Designation Arguments

1          MR. WILLIAMS:  I'm sorry.  Those are different

2     subjects.

3          MR. BALL:  This is the whole key.  There was not -- it

4     was not an Abbott admission that as of 1999 valproate was four

5     times higher risk.  That -- that's what they're trying to use

6     this for is that.  And the Judge said it should be based on

7     current knowledge and it would be hashed out at the time --

8     this is a quote from the label.  This is the whole reason for

9     the big to do about the label and the motions in limine and

10    everything else is to avoid that kind of statement.

11         MR. NOVOSAD:  Twenty-five and 27 are also quotes from

12    the label it.  Doesn't make 24 less true.

13         MR. BALL:  They are -- but those are not -- those are

14    not, not based -- there was information -- there was no

15    information in Number 24 that was known in 1999.

16         MR. WILLIAMS:  It's just a valid fact they don't

17    contest the fact.  It's an admission.  And it would be very

18    prejudicial to the plaintiffs that we can't get in what's an

19    admission and what is -- just simplist terms it is the truth.

20         MR. NOVOSAD:  And I guess why --

21         MR. BALL:  Just because it is the truth today doesn't

22    make it --

23         THE COURT:  Okay.  Here's --

24         MR. NOVOSAD:  Why can't you explain that -- through a

25    witness that there was no pregnancy registry at that point?

1        And I think your Honor has ruled that what's known or

2    could have been, should have been known by Abbott is what's

3    relevant.  And this pregnancy registry data should have been

4    known but there was no registry at the time.

5        THE COURT:  Okay.  Here's how I see it:  I'm going to,

6    I guess, overrule Abbott's objection because this -- first of

7    all, the qualification says, as of one point in time.  I

8    excluded the label and I haven't gone back to read it, but my

9    reasoning in that was that the label itself I think would be --

10   there is a great risk of unfair prejudice because if they

11   actually see what the label says today -- but that doesn't

12   mean -- I mean I think the label would otherwise be relevant on

13   the issue of causation.  And this was answered -- I'm not going

14   to go over and rehash everything that Judge Williams, God love

15   him, went through.  It's been out there.  It was admitted.

16       So that -- so 24 -- the objection of 24, 25, and 27 is

17   overruled.

18       Quite honestly, I don't know if the jury will

19   understand it, but it was an admission and that will be read.

20       Okay.  Any more of these?

21       MR. BALL:  Yeah.

22       THE COURT:  I have a whole stack.

23       MR. BALL:  Judge Williams also said that we could

24   propose a limiting instruction.  In light of the ruling, I'm

25   going to think about that --

1            *THE COURT:*  Okay.

2            *MR. BALL:*  -- if that's okay with you.

3            *THE COURT:*  That's fine.

4            *MR. BALL:*  And -- and so the record would reflect that

5     my same objections for 24 are also on 25 and 27.  And you are

6     overruling those?

7            *THE COURT:*  Correct.

8            *MR. BALL:*  Thank you.

9            Twenty-nine.  And, see, this is -- this is repetitive

10    of 24.  The only words that are missing are "pregnancy

11    registry."  So it seems to me it ought to be one or the other.

12    And I really -- certainly I wish I would have remembered this

13    because I was meaning to say that 29 is more appropriate.  If

14    my objection was I'm going to be overruled, it is more

15    appropriate than 24, which reference to pregnancy registry.

16           *THE COURT:*  What do plaintiffs say to that?  Because

17    they do seem to be a little overlapping.

18                       *(Attorneys conferring)*

19           *MR. BALL:*  If they want to think about that and we can

20    think about it and pick one or the other and make a record on

21    that.

22           Does that make sense, guys?

23           *MR. NOVOSAD:*  Yeah, that's fine.

24           *MR. BALL:*  Okay.  We will figure that out.

25           *THE COURT:*  Yeah, think about that because it seems

```
 1   like...
 2          MR. NOVOSAD:  We will pick one or the other.
 3          THE COURT:  Okay.  That -- that seems like a
 4   reasonable approach.
 5          MR. BALL:  Number 30, we don't have an objection to.
 6          THE COURT:  Okay.
 7          MR. BALL:  Number 34, we don't have a -- I mean this
 8   comes from the -- this comes, I believe, right from the label
 9   again, so it would be the same kind of objection we had before
10   that this is a backhanded effort to put in the new label.
11          THE COURT:  Okay.  Well, then my ruling will be the
12   same, that will be overruled.
13          MR. BALL:  And my basis for my objection will be the
14   same.
15          THE COURT:  Okay.
16          MR. BALL:  And so, Heath, where does that leave us
17   now?
18          MR. NOVOSAD:  Thirty-five is also -- 35 is a different
19   one.  I thought you said were you okay with 35 earlier.
20          MR. BALL:  Let me see.
21          Right.  I mean this is back -- this is even -- this is
22   even worse than 24 in some respects because it is all right
23   from the label.  And now we are getting into very specific
24   comparisons and odds ratios on information that was not known
25   or knowable during this 10.7 -- I mean none of this was in the
```

1   comparison to -- here's another fourfold increase.  So this is

2   a third time that we've gotten into that.  So it seems to me

3   that they ought to be able to say fourfold one time in as

4   limited a way as possible in light of the -- I mean I'm not

5   agreeing that they should.  But if they are going to be allowed

6   to do that it ought to be one time in the most limited way

7   possible, which is either 24 and 29 and not all this data that

8   wasn't possibly available.

9        THE COURT:  Okay.  I agree.  I'll sustain your

10   objection to 35 because that's a lot of detail that...

11        MR. BALL:  And what are we left with now?  The dollars

12   or do we have one more?

13        MR. NOVOSAD:  Right, we have rog 11, identify the

14   first pregnancy registry.

15        MR. BALL:  Where is that?

16        MR. NOVOSAD:  Page 13.

17        MR. BALL:  Yeah, I don't have objection to that.

18        THE COURT:  Okay.  No objection to Interrogatory

19   Number 11.

20        Next is number seven.

21        MR. BALL:  Okay.  Where is that?

22        MR. NOVOSAD:  That's the dollars, the sales figures.

23        MR. BALL:  Sales figures.  Okay.  They have a whole

24   series of papers here of discovery responses relating to

25   dollars.  And my objection to that is as follows:

1    Interrogatory Number 7 is the information from 1995 and 1999

2    has already been read into the record over our objection in one

3    of the company witness depositions and the -- we had a long

4    discussion about this when we were going through the depo

5    designations.  And I can't remember if it was Lafond or

6    somebody like that and -- or Carbone, one of those two.  And

7    your Honor said, okay, I'll let them go through 1999 on these

8    figures right there.  Those are the same figures that were read

9    in the evidence.  You said nothing after '99.  And you

10   overruled our objection to sales figures.  So this is

11   cumulative and it is obviously far beyond your ruling.

12            MR. NOVOSAD:  All right.  I think there is a couple of

13   things.  First of all, on seven we have got the net sales

14   figures on the first page and the second page starts going into

15   the gross sales figures, the higher numbers.  And really

16   there's a couple of things to this.  I think, one, in order to

17   read it, I think our argument goes seven along with 13, which

18   is some -- some budget information for sales and for R&D.

19            And I think what is important about these on a couple

20   of levels is, one, Abbott has no data on their sales figures

21   prior to 1990 on net sales, prior to 1995 on gross sales.  For

22   us to be able to make a profit margin calculation, we have very

23   limited data.  Their cost data from Number 13 doesn't even

24   begin until 2002 for R&D, 2006 for marketing and promotion, and

25   2002 again for division margin.  So we'd love to be able to use

1   the data from 1990 -- from '78 to '99 to be able to calculate

2   those figures.  We've asked for the data.  They say they've

3   looked for it, tell us they've looked hard for it, can't find

4   it.  So we are limited on that.  That's one reason why we think

5   these should come in post-'99.

6          The other one is, as your Honor is aware, we have been

7   telling a marketing story for a week and a half now.  And I

8   think something that's important is that I think we should show

9   that marketing works.  And when you put together their response

10  to Interrogatory 13 and you see their marketing budget in 2006,

11  151 million; 2007, 126 million; 2008 plummets down to

12  59 million.  And then you go back and look at their sales

13  figures in the -- you know, the kind of same time frame, 2006

14  net sales of 1.2 billion; 2007, 1.48 billion; 2008,

15  1.6 billion.  And then when the marketing stops, their sales

16  figures plummet to 300 million, down to 160 million.  So I

17  think there's two reasons that the post-'99 comes in.  One is

18  that we have more data with which to calculate these -- these

19  profit margins.  And, two, to -- to further the marketing story

20  that marketing matters, marketing works.  Promoting the drug

21  led to sales.  They stopped promoting, sales fall off.

22          MR. BALL:  There is zero evidence in this case from

23  what he just said.  During this time when the sales went up,

24  there were new indications, bipolar, and migraine, and partial

25  complex seizures were all approved.  Okay?  Then later on

```
 1   during that time period, competitive drugs came on the market

 2   for some of these same indications.  So this line their trying

 3   to draw unfairly is not supported by any evidence except lawyer

 4   talk, number one.  And number two is, as I said before when we

 5   argued this last week, monetary information like this is

 6   irrelevant and unfairly prejudicial.

 7          Your Honor has let in a few years of -- of sales

 8   figures through depositions and a couple years of marketing

 9   budgets.  That's enough.

10      And to allow years -- I'm not even arguing the post-1999

11   because I think that's already been resolved, for sure.  But to

12   allow net sales, gross sales, division profit margins, to allow

13   all that in is compounding what I think is irrelevant and

14   unfairly prejudicial information.

15          THE COURT:  Hang on one second.  I want to look at

16   something.

17          Okay.  Anything else you wish to say, Mr. Novosad?

18          MR. NOVOSAD:  Well, your Honor, Mr. Ball says there is

19   no evidence of any of this, except for their verified signed

20   interrogatory responses, which show a true correlation between

21   advanced promotion and advancing sales; decreasing promotion,

22   decreasing sales.

23          MR. WILLIAMS:  It is pretty clear, your Honor, that

24   the more they put into it, the more they excel.  And they, of

25   course, have more indications.  We will concede that.  You will
```

Deposition Designation Arguments

1    also see that, as soon as this drug went -- two things

2    happened.  One, the information came out finally from the

3    Holmes Registry, and the sales plummeted of this drug.  And it

4    went off marketing, and so they pulled the plug -- it went off

5    patent and they pulled the plug on their marketing expenses

6    because other people could make it.

7          And it -- and that's the evidence; that this drug was

8    so -- it was just being -- it was pushed by this tremendous

9    marketing issue.  And with regard to some of the post-1999

10   stuff, those -- we are limited by the evidence they have

11   produced, and you have -- that's the best evidence we can come

12   up with from which we can calculate and have calculated that

13   this drug made 80 percent or more profit.  Now, we have asked

14   them for the other numbers from the past, and they have some

15   document retention policy, and they say the information is not

16   available.

17         So they put us -- their destruction of documents put

18   us where we are.  And this evidence is the only evidence that

19   is, according to them, available from which we can calculate

20   and have that this is an 80 percent profit drug.

21         *MR. BALL:*  So now we are going to get -- talk about

22   the fact that it went generic, went off of patent so there

23   could be competition.  We are now up to 2008 and '9.  We have

24   already argued the 1999 cutoff.  That's already been argued,

25   and the judge made a clear ruling about that.  Now we are going

1   to be talking about what the growth was ten years later, and we

2   are going to get into that.  We have to then come in and

3   explain that it was off-patent, and now we have a different

4   kind of -- my word.

5        THE COURT:  Well, here is how I see this.  I am going

6   to sustain the objection to Interrogatory Number 13.  Now, I

7   have allowed some evidence of market growth and sales figures.

8   Some of that has already come in.  And I've said in the order

9   on the motion in limine that evidence about -- again, according

10  to Judge Herndon, evidence about sales goals are certainly

11  relevant when it may impact the decision-making regarding

12  labeling.

13       But to put this in -- and I can't just say because it

14  was an interrogatory that that makes it relevant because, of

15  course, we were preparing numerous cases.  So to show this to

16  the jury -- they have already heard some evidence about the

17  marketing practices, the sales goals, the revenue, and I have

18  let that in.  But I think that putting this interrogatory in

19  front of the jury would be -- there would be a danger of unfair

20  prejudice or confusion of the issues.

21       MR. BALL:  Which ones are we saying, then, so we are

22  clear?  7.

23       THE COURT:  Well --

24       MR. BALL:  The ones that are at issue are 7 and --

25       Help me, Heath.  7 and -- is it all 7?

1          *MR. NOVOSAD:*  7 is all of the net and gross sales

2     figures and 13 are the R&D marketing promotions.

3          *MR. BALL:*  Yeah.  So 7 and 13 are both out.

4          *THE COURT:*  Well, now, 7 has dates that...

5          *MR. BALL:*  Up to 1999.

6          *THE COURT:*  Up to 1999.

7          *MR. BALL:*  So 7 up to 1999, and the rest of it is out.

8     Okay.

9          *MR. WILLIAMS:*  Your Honor, if I may.  The reason --

10    and I'm not arguing all of post-1999 should come in.  I have

11    one specific focus, and that is, What was the profit on this

12    drug?  And the only years that they give us for division margin

13    is Item No. 3 on Interrogatory Number 13.  So the first year

14    they give us is 2002.  And only by having that 2002 number and

15    going back to Interrogatory Number 7, looking at 2001, can one

16    come up with the margin.  And what we did was use all the

17    available data that they gave us over a time period to come up

18    with the margin.  And so, you know, it's the absence -- when

19    they say there's no data on margin before 2012...

20          *MR. BALL:*  No.

21          *MR. WILLIAMS:*  2002.  My mistake, misspeak -- did they

22    say, well, you -- they want us to believe there is no way to

23    calculate what their profit was back then.  And that's their

24    fault.  You can calculate it because you can look at what it is

25    in 2002.  And using -- the only reason we need some 2002 post

1    numbers in is because of Number 3, to compare that with sales

2    so you can see how profitable this drug was.

3          And that is certainly a very big motivation as to why

4    they did this drug the way they did.  If the Court recalls,

5    they internally discussed this as a cash cow.  They did all

6    kinds of studies, you know, about -- I think we heard one

7    today, where they figured out exactly what the effect is of

8    everything they did on sales.  They want to say there is no

9    evidence.

10          *THE COURT:*  So are you saying that, at a minimum,

11   you'd want 2002 division margin?

12          *MR. WILLIAMS:*  I think Brian -- Brian Abramson.

13          Brian, would you tell them how you did this?

14          *MR. ABRAMSON:*  Sure, your Honor.  We took the division

15   margins that were in -- I guess this is Interrogatory 13,

16   Number 3 -- from '02 to 2012, compared that to the net sales

17   that are in Interrogatory Number 7 and calculated a profit

18   margin -- an average profit margin of those years, which was

19   the only way that we could figure out, since we don't have any

20   division margin information for years prior to 2002, what the

21   average profit margin was for the drug.

22          *MR. WILLIAMS:*  Okay.  And if we could just somehow

23   reach an agreement to use that math, that may be a way to get

24   around that.  That may be a way to get around putting it into

25   evidence, if we could agree to just use that math.

1          *MR. NOVOSAD:*  Another stipulation.

2          *MR. BALL:*  Profit margins are not admissible, okay.

3    And I can't help that they waited 12 years to ask for this

4    information.  I can't help that this lawsuit was brought 12

5    years after the child was born.  And it's not -- they act like

6    it's our fault.  I've heard that two or three times.

7          *MR. WILLIAMS:*  You destroyed the evidence.

8          *MR. BALL:*  Boy, oh, boy, oh, boy.

9          *THE COURT:*  Okay.  Let's stay on point.

10         *MR. BALL:*  Your Honor, we object to anything post-1999

11   in any way.  We have already made our record about financial

12   matters in general in this, but we certainly object to anything

13   after 1999.  And it is an unfair accusation to say something

14   like we destroyed the evidence, when they waited 15 years or 12

15   years to bring this lawsuit.  It is also a violation -- well,

16   they didn't do it in front of the jury.  The Court also said --

17         *THE COURT:*  Right.  Right.  I'm with ya.

18         *MR. WILLIAMS:*  Well, Judge, I don't know why it is

19   unfair to say it.  They did destroy it.  They did.  It is gone.

20   They destroyed it.  Now, whether they violated the rules about

21   a legal hold -- we fought with that in front of Judge Williams.

22   But the fact is, they destroyed the evidence.

23         *MR. BALL:*  Okay.  That was --

24         *THE COURT:*  Explain to me what --

25         *MR. WILLIAMS:*  Simply within their control.

1          THE COURT:  -- Subpart 3 of Interrogatory 13 gets you

2     beyond the information from, like, '90 -- say we say '90 to

3     2000 in Interrogatory Number 7?

4          MR. WILLIAMS:  Because Subpart 3, you don't -- we

5     don't have that information.  You have to compare.

6          MR. NOVOSAD:  Your Honor, at the bottom of Number 3, a

7     given years division margin is net sales minus cost of sales,

8     R&D, selling, general administrative, et cetera.  So in order

9     to get -- in order to get -- the net sales figure doesn't get

10    you there alone.  The division margin is using the net sales,

11    but you need more, and we don't have this margin on the net

12    sales.

13         MR. ABRAMSON:  To clarify a little bit, it's to get

14    the actual profit margin.  The only way to get the profit

15    margin is to have the net sales figure and the division margin

16    figure.  We don't need any of the other post-1999 data.  I

17    mean, you have already ruled on that.  But that's the only way

18    to get to the actual profit margin.

19         MR. WILLIAMS:  And, see, we asked for net profits.  If

20    you read Number 13, it asks for net profits for Depakote.  We

21    asked for it, and that's what we got.  And so now -- you know,

22    we are where we are.  The evidence -- the whatever stuff they

23    have from the past is no longer available, according to Abbott,

24    so we are going to do the best we can do.

25         MR. BALL:  I'm not familiar with the principle that

1    let's net sales -- or excuse me -- net profit margin computed

2    by a lawyer to come into evidence.  I'm not familiar with that

3    legal principle, and I'm most certainly not familiar with the

4    principle that says a company has to keep all of its documents

5    for 15 years.  I mean, you know, with all due respect,

6    Mrs. Kaleta didn't take any steps to preserve her medical

7    records for 1995 to 1999, the years leading up the pregnancy.

8    So let's just get off of that and that issue and quit casting

9    stones and talk about the relevance and -- the irrelevance and

10   unfair prejudice related to bringing in big numbers and things

11   like that after 1999.

12           MR. WILLIAMS:  I don't intend to bring in a big

13   number.  I think the calculation is what the calculation is.

14   You just -- you have division margins and you have sales.  And

15   it's this -- it's this simple.  If I had a division -- if I had

16   sales of a hundred dollars and my division margin was $80, then

17   the net profit is 80 bucks, or, you know, you can compute those

18   things.  It's just that simple.

19           We asked for the net profits.  They chose not to give

20   us net profits.  They didn't answer this.  And we fought about

21   it.  And they said, Well, this is all the evidence we've got.

22   It's not a calculation -- it's not an important formula.  All

23   I'm trying to get -- put the numbers aside, Judge.  Let us do

24   the calculation, and the percentage is what the percentage is

25   on the data that's available.  And that is relevant in this

1   case because, as we've seen, this was a cash cow; 23 percent of

2   all their net sales came from this one drug.

3           *MR. ABRAMSON:*  Your Honor, why could we not offer the

4   percentage as a stipulation without bringing in any of these

5   other numbers?

6           *MR. WILLIAMS:*  Let them choose.

7           *MR. BALL:*  Because we are not going to stipulate,

8   period.  We are not going to stipulate to irrelevant and

9   inflammatory and unfairly prejudicial evidence.

10          Your Honor has already given them great leeway on this

11  in a case that's supposed to be about the adequacy of the

12  warning and causation.  The Court has given them great leeway

13  about getting in sales figures and sales goals and marketing

14  budgets, and now they want to just keep on going.  And it has

15  to stop.

16          *MR. WILLIAMS:*  We asked for net profits.  They say the

17  evidence we have -- we no longer have it.  And they won't

18  stipulate to what the formula is.  And, therefore, Judge, we

19  are left where we are, and it is very relevant information as

20  to how profitable this drug was.  And there is one way to

21  calculate it, and if they destroyed the information that was

22  back then, then let's just calculate on what they did produce.

23  And we don't have to put in the numbers if we can do the

24  calculation, but they say they won't stipulate.  So...

25          *THE COURT:*  So you are saying for the division margin

Deposition Designation Arguments

1   that 2002 would get you the data that --

2        MR. ABRAMSON:  We took an average of the division

3   margin years they provided us.  So in the years that there was

4   a division margin and net sales, we took each of those numbers,

5   compared them, and then took the average of that ten years and

6   used that as the profit margin figure.  So we wouldn't need --

7   we wouldn't need to bring in the big numbers of their division

8   margins in the later years.  We would just be stipulating to

9   the actual average percentage that gets you to the profit

10  margins, since we don't have the ability to calculate that

11  margin otherwise.

12       MR. WILLIAMS:  We asked for it.  They are the ones

13  that refused to give it so -- you know, don't put us at peril

14  because they refused to give it.  We asked.

15       MR. BALL:  We asked for Mary Kaleta's medical records.

16  Don't put us in peril.

17       MR. WILLIAMS:  Don't change the subject.

18       THE COURT:  I understand.  Yeah.  We are not going to

19  go there.  I need to think about this one for a little bit, so

20  I'm going to just hold off on 7 and -- Interrogatory 7 and 13.

21  But just so that I'm clear, then, you wouldn't -- even if I

22  allow -- so 7 goes -- has pre-1999 data.

23       MR. WILLIAMS:  Correct.

24       THE COURT:  Okay.  And then you want to do some

25  calculation based on the division margin information.

1          *MR. WILLIAMS:*  And they chose -- they -- the only

2     division margin is later on, and that's the way you can find

3     out how profitable this drug is.

4          *MR. ABRAMSON:*  Yeah.  We wouldn't want to show the

5     actual net sales or division margin figures post-1999.  We

6     would just want to use those numbers to arrive at the actual --

7     average profit margin for those years and use those numbers.

8          *THE COURT:*  So what would we actually show the jury?

9          *MR. WILLIAMS:*  Your Honor, that would depend on your

10    ruling, obviously.  But we can -- what we can do is, we can

11    show you our math and show them our math, how we calculated

12    these things, and then you decide whether it's for one year or

13    over the available information.  You pick which one, and we

14    just show them the percentage, if you want.  But that's the way

15    to avoid any prejudice by sales post-1999.

16         *THE COURT:*  Okay.  Why don't you put together

17    something of what you are thinking because I'm not sure I

18    totally understand it, and I'll be thinking about it.

19         *MR. WILLIAMS:*  I will let my brain do that.

20         *MR. NOVOSAD:*  We have one more of these.

21         *MR. BALL:*  The last one is...

22         *MR. NOVOSAD:*  Interrogatory 15.

23         *MR. BALL:*  So -- if I can just hand this up to you.

24         *MR. NOVOSAD:*  She has it.

25         *THE COURT:*  I think I have it.  I have something here.

1          *MR. BALL:*  Interrogatory 15 is attached to this -- is

2     several hundred papers -- or several hundred studies on humans

3     relating to teratogenicity, and included in there are six

4     animal studies.  So they asked in interrogatory, of all of

5     these hundreds that are attached, which ones studied -- which

6     ones studied teratogenicity.

7          Well, as we've heard multiple times in this case, you

8     can't do a clinical trial to study teratogenicity in a human, a

9     woman, so we can only do it in animals.  But what they want to

10    do is, look, there was 300, 400, whatever this totals up to,

11    and they only did six studies on humans.  Talk about something

12    that is unfair.

13          *THE COURT:*  Animals.

14          *MR. BALL:*  Excuse me.  Only on animals.

15          They only did six studies -- out of 400 studies, they

16    only did six that did birth defects.  We have already kind of

17    heard that theme played out in opening statement.  You recall

18    some kind of scale or something.  And this is what they want to

19    do here, and this is unfairly prejudicial to read this

20    interrogatory with this exhibit attached out of context like

21    that and put it in front of the jury, when everybody, including

22    their own witnesses -- all three of their witnesses -- admitted

23    that you could not study teratogenicity in a clinical trial in

24    a human.  That's just so unfair.

25          *THE COURT:*  Okay.

Deposition Designation Arguments

1          *MR. NOVOSAD:*  Your Honor, that's -- so what --

2     Interrogatory 15 is identified which studies on Exhibit A --

3     which studies, not clinical studies, not case-controlled, which

4     studies.  If you look -- if I could hand up -- Dan, here -- I'm

5     going to hand up the cover letter, if I may approach.

6          *THE COURT:*  You may.

7          *MR. NOVOSAD:*  This is the cover letter to Exhibit A

8     and the order that it came from.  This is a list of Depakote

9     scientific studies, like registries, and I think that it is not

10    unfairly prejudicial at all to say that Abbott did 750 studies

11    on Depakote, 6 of which were on teratogenicity; 750 studies to

12    work on expanding the market to work on new indications, to

13    work on expanding sales, pushing the drug.

14         What are you looking for?

15         *MR. BALL:*  Your exhibit that you handed me.

16         *THE COURT:*  Okay.  Hang on.  Let me read this.

17         *MR. BALL:*  I got it.  I got it right here.  Never

18    mind.  Go ahead.

19         *MR. NOVOSAD:*  So I think that it's fairly prejudicial.

20    Of course, it's prejudicial.  But the test is unfairly, and

21    quite simply Abbott chose to conduct 700-something studies on

22    Depakote, 6 of which were on teratogenicity.  They could have

23    done more.  They could have done a registry.  They could have

24    done a number of things, and they chose not to.  This is just

25    simply the facts of the case and studies to expand the market,

1    studies on the harms.

2         THE COURT:  So would you propose to show the jury

3    Exhibit A?

4         MR. NOVOSAD:  To show the jury Exhibit A -- what we --

5    not the whole thing, and we certainly do not intend to read

6    Exhibit A word-for-word exactly.  I think that there's a couple

7    of things -- you know, showing this to them, counting the

8    studies, and we could use that as a count and say, you know,

9    Abbott provided a list of -- and I would need to do the exact

10   counting of them but -- I mean, the jury, I think, deserves to

11   understand and needs to understand, again, that the research

12   that was done by Abbott, by a 250 to 1 margin almost -- maybe

13   my math is off -- 750 to 6 margin was to promote it, expand it,

14   as opposed to see if it is safe for women who may become

15   pregnant.

16        MR. BALL:  I can't state my objection any more clearly

17   than that.  You have just heard exactly what their purpose is.

18   You've heard exactly what their purpose is.  And it is to

19   create an impression that -- when we couldn't have possibly

20   done 700 studies of teratogenicity.  It is impossible to do.  I

21   can't go through every one of these, but I can safely say

22   that -- I mean, there is dog studies and rat studies and mouse

23   studies.  There's all kinds of things -- and we can't -- I'm

24   not even sure the majority of these aren't that.

25        But we cannot -- they want to just put a number up, 6

1  versus 700 or whatever it is.  That's all they want to do.  And

2  that context and that use of this is unfairly prejudicial, and

3  that's why we are objecting to it.

4        MR. WILLIAMS:  Your Honor, if you look further in the

5  six they did, five of them were in 1975, one of them was in

6  2001.  So it just is further support of what we said in opening

7  statement, if the Court recalls that.  In the 14-year gap

8  between 1978 and -- the 18-year gap -- a 14-year gap between

9  '82 and '96.  And that 14-year gap -- they did hundreds of

10 studies to expand the market and none, during that time period,

11 for safety.  And that's the point.

12       THE COURT:  Okay.  Give me one minute.  I want to read

13 this letter.

14        Well, here's where I am on this, and I don't like to,

15 you know, give rulings that are not clear.  I think there is

16 relevance.  It is prejudicial, but I don't think it is unfairly

17 prejudicial, that there were six studies done on

18 teratogenicity.  I'm getting better on that word.  But I'm not

19 sure the format in which -- I mean, I think this will be very

20 confusing if the jury saw all of this.  So come up with some

21 way to say that or identify what those are.

22       MR. WILLIAMS:  That was my slide on opening, Judge.

23       THE COURT:  I don't remember it.  I'm sorry.

24       MR. BALL:  It was not a great slide for --

25       MR. WILLIAMS:  It had the one way up here and the 700

1    down here.  But that's the point.  Maybe we can just stipulate

2    that Interrogatory Number X says there were six studies and --

3        MR. BALL:  Why don't we with your stipulation add that

4    99 percent of those studies could not have possibly been done

5    on women.

6        MR. WILLIAMS:  That's not in the interrogatory.  But

7    you can argue that, Mr. Ball, and you have.

8        MR. NOVOSAD:  I think something to the effect of --

9        MR. BALL:  I was not conceding the admissibility --

10       THE COURT:  I know.  I know.

11       MR. BALL:  -- saying that.

12       THE COURT:  But we are going to have to come up with

13   something about the number of studies that were done and that

14   there were six done.

15       MR. NOVOSAD:  I would propose tracking kind of the

16   language of the letter and this:  Abbott conducted or funded X

17   number of Depakote scientific studies.  Six of them could be

18   considered Depakote teratogenicity studies.  That tracks the

19   letter describing the studies and the interrogatory response

20   listing them.

21       MR. BALL:  Are we going to -- the other thing, your

22   Honor, we might use some guidance on if you -- is a time frame

23   here.  Shouldn't this be limited to pre-'99?  Shouldn't we be

24   talking about that?

25       MR. WILLIAMS:  We'll concede that.

1          THE COURT:  Yeah.  I think that -- because all of

2     these teratogenicity studies predate 1999, correct?

3          MR. WILLIAMS:  Sure.

4          THE COURT:  Okay.  So limit the studies --

5          MR. BALL:  All right.  With the Court's ruling and

6     guidance we will --

7          MR. NOVOSAD:  We will need guidance on that, your

8     Honor, because, again --

9          MR. BALL:  She said.

10         MR. NOVOSAD:  -- these are Abbott studies.  So if

11    there is ones that you want us to take off of here that we

12    can't see from the protocol number.

13         MR. BALL:  If you can't tell they're 1999?

14         MR. NOVOSAD:  Right.

15         MR. BALL:  We will look at that.

16         MR. NOVOSAD:  Right.

17         THE COURT:  Take a look at that.  Okay.

18         MR. WILLIAMS:  And to qualify a little bit more, if we

19    could, since we only have six that were safety, I would like to

20    show those -- to show the dates because...

21         THE COURT:  That's fine.  It's the -- it's the title

22    of it, but I mean it's this whole exhibit I think would be very

23    confusing to the jury.

24         MR. NOVOSAD:  We were not going to do that.

25         THE COURT:  The title of what the study was or the

Deposition Designation Arguments

1   date or what it was done on or -- limited information.  Is that

2   enough guidance?

3        MR. BALL:  Yeah.  And I will tell that part of --

4   whether they accept it or -- which I don't think you will or --

5   you accept -- part of our context in this proposed stipulation

6   will be the ability to test in women.  That's part of what we

7   will --

8        THE COURT:  Well, sure, and the jury has heard that.

9   And I think that everybody understands you can't test on women.

10       MR. BALL:  Okay.

11       MR. NOVOSAD:  Thank you, your Honor.

12       THE COURT:  What -- while we're talking about

13   stipulations, let me throw this out there.  I saw -- I just

14   looked at it quickly -- that plaintiffs filed another proposed

15   jury instruction about this general causation business, and

16   that seems to me something that would be more appropriate if we

17   can reach a stipulation on the language of that.

18       MR. BALL:  I saw that too, and I'm thinking about

19   that.

20       THE COURT:  Okay.  Be thinking about that because I

21   don't think it is really an instruction I should give the jury,

22   but if we have some stipulations and we read them all in at the

23   same time.

24       MR. BALL:  What I was thinking of -- can we go off the

25   record for a second or no?

1          THE COURT:  Yes.  We can go off the record.

2              (An off-the-record discussion was had)

3          MR. BOUNDAS:  I think we have three more depositions,

4   and hopefully we can make them brief.  The first one is Lee

5   Muraoka.  He is an Abbott regulatory witness, and I think there

6   are really only two points.  He was their 30(b)(6) regulatory

7   witness.  I think we have it down to, like, 14 minutes or

8   something is our offer, and there are really two points.

9          THE COURT:  I'm sorry.  He is Muraoka and he is what?

10         MR. BOUNDAS:  He was the 30(b)(6) witness regarding

11  regulatory issues, including FDA issues.

12

13         MR. MacWILLIAMS:  And so Molly has a fighting chance,

14  your Honor, it's M-U-R-A-O-K-A, Muraoka.

15         THE COURT:  Okay.

16         MR. BOUNDAS:  So the first offer was -- is -- just

17  having Mr. Muraoka confirm the regulation that Abbott is

18  required to provide a summary to the FDA on an annual basis of

19  information that would affect the safety of the product.  So we

20  showed in one of the federal regulations, which he must work

21  with regularly, but they're required to send FDA all the safety

22  information they have; and then, second, to be clear that

23  Abbott owns the label and that Abbott has the ability to change

24  the label to make additional warnings.

25             In light of the cross examination that Dr. Blume --

1   the cross of Dr. Blume, I think that it is relevant to have

2   Abbott's regulatory witness acknowledge very clearly that

3   Abbott has a duty to -- under the regs -- and this isn't one of

4   these legal, moral, ethical things -- to both submit safety

5   information to the FDA and, as appropriate, change the warning.

6   So that's the one offer, and maybe we can take that up.

7          THE COURT:  Yeah.  Let's just take them one at a time.

8          What's your objection to that?

9          MR. MacWILLIAMS:  So, on that one, your Honor, I

10  actually see it the same as the legal duty thing.  To read the

11  CFR to the witness and to the jury and say, And this is your

12  duty, again, respectfully, that's your job.

13         THE COURT:  Yeah.  Well, I agree.  But I think it is

14  relevant that the jury understands, you know, this is a

15  regulatory guy, and he's acknowledging what the regulations

16  are.  I don't see that as the same as a legal duty, so I will

17  allow that portion of his testimony.

18         MR. BOUNDAS:  Okay.  And then the second thing was the

19  situation in the late '90s.  Abbott had somewhere in the 50,

20  70, 80 number -- I don't know the exact number of birth defect

21  reports that they received from their partner Sanofi, and

22  Abbott did not submit those to the FDA as required.

23  Mr. Muraoka admitted that they would have been required to be

24  submitted within 15 days or, at a minimum, with the next annual

25  report.

Deposition Designation Arguments

1          So this goes to Abbott's -- and we acknowledge that

2     they ultimately sent these reports to the FDA, but we think

3     that this information is relevant -- also, the reports involve

4     children with not just spina bifida, but with facial

5     dysmorphism and with Fetal Valproate Syndrome, which is

6     something that Daniel has.

7          And the point here is that Mr. Muraoka acknowledges

8     that the company has a regulatory responsibility to submit

9     these things timely.  It wasn't like they were a few days late,

10    they were years late.  And I think that goes to Abbott's

11    defense as to whether they were conducting appropriate

12    pharmacovigilance.  I think the jury could see this bearing on

13    whether Abbott actually was monitoring the safety of this

14    product.  We have heard in this trial that they were reviewing

15    the literature and doing all the right things, and I think this

16    bears directly on that issue.

17          THE COURT:  Okay.

18          MR. MacWILLIAMS:  So I think Mr. Boundas said the late

19    '90s and he meant the late '80s.

20          MR. BOUNDAS:  '80s.  I'm sorry.

21          MR. MacWILLIAMS:  Which is a critical distinction

22    here, your Honor, because Abbott did lose track of a bunch of

23    AEs that they had received from Sanofi.  They found them, and

24    the evidence of record is that in expedited fashion -- like in

25    a couple days or over a weekend or something -- they got them

1    together, consulted with the FDA by phone, asked the FDA, How

2    do you want us to deliver these?

3            The FDA said, This is the format you put them in.

4    They did it and send it off to the FDA.

5            And then, most crucially, Dr. Blume, in her

6    deposition, said it had no impact on anything in this case,

7    that we never failed to submit to the FDA anything that we were

8    required to submit.  It was a timing issue ten years before

9    Danny's birth.

10           It is just the bad company evidence, your Honor.  You

11   all made a mistake in 1989, and, therefore, you must have made

12   mistakes in 1990 and 1991 and 1992, all the way up to 1999.  It

13   is not true, and their witness says it had nothing to do and no

14   impact whatsoever on this case.

15           MR. BOUNDAS:  Your Honor, just brief response:  I

16   don't think the issue is she said it had no -- it didn't affect

17   the labeling, and that's not really our point.  It is that, you

18   know, and this isn't like a small mistake.  I mean the whole

19   issue in this case is whether Abbott was appropriately

20   monitoring the literature and the safety profile of this drug

21   and, oh, we have numerous reports of children with birth

22   defects and we misplaced them or -- you know, there's nothing

23   in here about --

24           THE COURT:  Yeah, I agree.  I think it is relevant.  I

25   mean that's certainly -- I mean one of the big issues in this

1   case is what information Abbott had and what it did with it.

2   So I find that that's relevant, not objectionable, and it will

3   be overruled.

4           MR. MacWILLIAMS:  Okay.

5           MR. BOUNDAS:  That's all we had for Mr. Muraoka that

6   I'm aware of.

7           MR. MacWILLIAMS:  So, your Honor, the third one from

8   our perspective there is more discussion of the Tridione issue.

9           Is that out?

10          MR. BOUNDAS:  I'll get rid of that.

11          MR. MacWILLIAMS:  Okay.  Look at that.

12          Thank you, John.

13          THE COURT:  Any more depos?

14          MR. MacWILLIAMS:  Two more depos.

15          THE COURT:  Okay.

16          MR. MacWILLIAMS:  Steck, Mr. Williams.

17          All right.  So, your Honor, these -- this is James

18  Steck.  He is a former regulatory official.

19          THE COURT:  I'm sorry.  He is a what?

20          MR. MacWILLIAMS:  A former Abbott regulatory affairs

21  guy.

22          THE COURT:  Okay.

23          MR. WILLIAMS:  Michael, if I may interrupt.  Again,

24  I'd reassert if they will commit on the record to bring Steck

25  live, we won't show his video.  So he is listed as one of

Deposition Designation Arguments

1  two -- there is two people from Abbott that they have listed to

2  come:  Steck and Embrescia.  If they just commit that he is

3  coming, then this is all for naught.

4       THE COURT:  Is he coming?

5       MR. MacWILLIAMS:  I don't have that authority, and he

6  is a former employee, your Honor.  I would be out on a limb

7  holding a chain saw.  Though I might wish we could do that,

8  there is just no chance.

9       THE COURT:  Okay.  Well, what's the issue with the

10  deposition?

11       MR. MacWILLIAMS:  So there is a number of different

12  issues, your Honor.  So, for example, does your Honor have --

13  do we have Mr. Steck's testimony for Judge Rosenstengel?

14       Oh.  I do, your Honor.  Here you go.  I think I do.

15  This is the latest I have.

16       THE COURT:  Okay.

17       MR. MacWILLIAMS:  So, your Honor, again, here are the

18  topics for which Mr. Steck was designated.  Abbott's

19  interpretation of the meaning and/or intended meaning of the

20  language in the Depakote label as revised from time to time.

21       See, I told you we had somebody like that.

22       Any and all changes made -- this is the second one.

23  Any and all changes made to the pregnancy warnings in the

24  Depakote label.  The reasons for any and all changes made to

25  the pregnancy warnings in the Depakote label.

1          Number 4, any and all changes proposed or recommended

2     by anyone in Abbott to pregnancy warnings in the Depakote

3     label.

4          Five, the reasons for any and all changes proposed or

5     recommended by anyone in Abbott to the pregnancy warnings in

6     the Depakote label.

7          Six, any communications with the FDA regarding

8     warnings proposed or recommended to be made to the pregnancy

9     warnings in the Depakote label but not implemented.

10         So what pregnancy warning changes were considered and

11    proposed to the FDA in related communications.

12         So, first of all, your Honor, that doesn't have

13    anything to do with pharmacovigilance and pharmacovigilance

14    analyses.  That's Dr. Embrescia's area.  This is testimony, for

15    example, at 121:5 through 7 and 20 to 23.

16         MR. WILLIAMS:  May I respond to that one, your Honor?

17         THE COURT:  You may.

18         MR. WILLIAMS:  Doctor -- Mr. Steck testified that he

19    was the man -- so he's both a fact witness and a 30(b)(6)

20    because he factually -- he was in charge of regulatory affairs

21    for Depakote in much of the pertinent time frame.  He says,

22    What I got from pharmacovigilance was factored in to what

23    changes we made in the label.  So asking about what he -- you

24    know, pharmacovigilance and stuff, they worked hand in glove,

25    is, I think, what the impression they want to create.  And so

1   that's why it's relevant.

2          THE COURT:  Okay.  Well, that objection will be

3   overruled.  I think that I can see the relevance of that.

4          MR. MacWILLIAMS:  Next one, your Honor, at Page 129.

5   This is another scope objection because Mr. Steck was asked

6   about whether Abbott tested or studied -- and to asking him to

7   name a clinical trial in which certain issues were tested or

8   studied.  So that's 129, starting at Line 15, over to 130.

9          MR. WILLIAMS:  Right.  And so regulatory affairs, you

10  have to -- have to rely on information that's provided to you

11  and we -- that's important to ask.  Were there any studies?

12  Because that, I assume, would go into his decisions as to what

13  to put in to the label or not put in to the label.  So that's

14  the relevance.

15         MR. MacWILLIAMS:  So I am loathe to read his

16  designation again, and I hope your Honor doesn't ask me to.

17  But he is the regulatory affairs, pregnancy warnings submission

18  guy.  And the question is:  "Can you identify any steps that

19  Abbott took to study those defects through 2001 when you were

20  no longer directly working on Depakote?"

21         So he doesn't have any personal knowledge.

22         MR. WILLIAMS:  You misread that.  It said through

23  2001, not in 2001.

24         MR. MacWILLIAMS:  I apologize.  I am clearing looking

25  at "through 2001."

1          *MR. WILLIAMS:*  And the Court understands the

2     awkwardness of the timing.  But since he left that section in

3     2001, we stopped at 2001.

4          *MR. MacWILLIAMS:*  He's clearly not the study guy.  You

5     have already heard from the study guy.  We have heard from two

6     study guys:  the animal study guy and the human study guy.

7          *THE COURT:*  Now is this -- Mr. Williams, are you

8     saying this is something that he is a fact witness he's

9     testifying to?

10         *MR. WILLIAMS:*  He is both a fact witness and a

11    30(b)(6) because he was the regulatory guy back then.  Now, he

12    was taken under a 30(b)(6).  But he will hopefully come to this

13    courthouse.  All of this would be moot if I just knew he was

14    coming because I could prove all this up in cross.

15         *THE COURT:*  Okay.  Can I see the designation?  Do you

16    have a copy of the designation?

17         *MR. WILLIAMS:*  Here's the -- not an expert because he

18    hasn't given an expert report.

19         *THE COURT:*  Right.  But how do you say this falls into

20    his designation as the label guy?

21         *MR. WILLIAMS:*  Because studies would impact -- if you

22    did studies and got information, that would impact what's in

23    the label.  And the whole point is he will come in and

24    vigorously defend the label.  And so it's pertinent fact is

25    there was nothing to defend.  I mean there was -- he didn't

1    have the information because they didn't give it to him because

2    they didn't do studies.  That's the way they suppress the

3    evidence.  That's pertinent to his decision-making.

4         THE COURT:  All right.  Well, I'll overrule the

5    objection.  I do see some relevance to it, and I don't think it

6    is outside the scope of his designation.

7         MR. MacWILLIAMS:  So for guidance, your Honor, just so

8    I know when we go back and try to sort this out, which of --

9         THE COURT:  Well, I was just looking at the question

10   at Page 129, Line 15.

11        MR. MacWILLIAMS:  Actually starting at Line 19: "Can

12   you identify any steps that Abbott took to study those

13   defects?"

14        THE COURT:  Right.  Correct.  So that question and

15   answer.

16        MR. MacWILLIAMS:  That goes to regulatory submissions

17   and the reasons for changes?

18        THE COURT:  Yes.

19        MR. MacWILLIAMS:  Okay.

20        Next one, your Honor, Page 230, Line 12, through 231,

21   Line 15ish:  And this is the wasn't Abbott targeting women

22   issue.  So, A, it's cumulative; and B, I don't know how it

23   could possibly relate to communications with the FDA regarding

24   warnings and Abbott's -- that's a marketing concept.

25        MR. WILLIAMS:  Well, of course.  Of course, this could

1  be relevant.  Your Honor, if I may.  The black box was put on

2  this drug because of the expanding market.  Expanding it to

3  migraine caused them -- the FDA -- to say if you are going to

4  go into migraine, you have got to put it on there.  And so they

5  had to make a business decision.  Do we want to expand and have

6  a black box?  And we have the document that shows that.  And so

7  he is the guy and we are asking him if they're targeting women

8  there.  And his answer is what his answer is.

9       MR. MacWILLIAMS:  That's a business decision, as

10  Mr. Williams has suggested.  To the extent I'm following the

11  thread of his thought, it has nothing to do with the regulatory

12  submission or proposed label changes or anything else that --

13  that was a regulatory function.

14       THE COURT:  Well, I disagree.  I see the relevance

15  because I think the label -- I mean Dr. Blume said that, that

16  the label was changed because it expanded to migraines.  So I

17  will overrule that objection.

18       MR. MacWILLIAMS:  Your Honor, next is Page 234.  And

19  this is the plaintiffs' argument about how two people can be

20  hurt -- 234, Line 5.

21       And, again, your Honor, we are back to -- I'm sorry.

22  Get to the correct page.  "Would you agree with me that a woman

23  of childbearing potential deserves a heightened degree of

24  safety information?"

25       The jury has already heard this line of questioning

1   and argument.  It doesn't have anything to do the regulatory

2   function or any communications with the FDA.

3           *MR. WILLIAMS:*  Judge --

4           *MR. MacWILLIAMS:*  It is just cumulative and

5   prejudicial.

6           *MR. WILLIAMS:*  -- of course, it does.

7           *THE COURT:*  How?

8           *MR. WILLIAMS:*  Because sometimes when you don't give

9   appropriate warnings, the most innocent are injured.  And in

10  this case the most innocent is a fetus.  And because -- you

11  know, there's just a basic concept -- it makes common sense --

12  that the higher the degree of harm, the higher you should have

13  a warning.  And this is a man that is in charge of the

14  warnings.  He is the warnings dude with regard -- at Abbott, as

15  far as I can tell right now.

16          *MR. BALL:*  He was not designated as the Abbott dude.

17                         *(Laughter)*

18          *MR. WILLIAMS:*  Okay.  I'll stipulate to...

19          *THE COURT:*  Well, I read on.  I mean, I'll overrule

20  that objection.  I see where this is going, and it is talking

21  about communicating the risk.  You are dealing with a product

22  that a woman of childbearing years is taking.  He's

23  acknowledging that's a standard of responsibility.  So I do

24  think it is within the scope of his designation.

25          *MR. MacWILLIAMS:*  That's it for Mr. Steck, your Honor.

1       THE COURT:  Okay.  I don't know -- I don't remember

2   who gave this to me.  Do you want it back?

3       MR. WILLIAMS:  Check and see.  If y'all are going to

4   bring him -- we don't --

5       MR. MacWILLIAMS:  John Eddie, I heard you the first

6   three times, I promise.  Is it -- are you trying to make the

7   point that I'm not running the show over here?  They get it.

8       MR. WILLIAMS:  No.

9       THE COURT:  Well, if you know, just so we don't have

10  to play the video.  Because I really -- I think the jury is

11  kind of losing it with the videos.  So...

12      MR. MacWILLIAMS:  I couldn't agree with you more, your

13  Honor.  But this ain't my first rodeo.  And witnesses of

14  Mr. Steck's age, for example, I don't have any control over

15  that.  I'm not going to cause a mistrial by making a commitment

16  I can't -- writing a check I can't cash.

17      All right.  Dr. Heimberger, your Honor.

18      THE COURT:  So I know I've heard her name.  Tell me

19  what the --

20      MR. WILLIAMS:  Have you gotten all the cuts?

21      MR. MacWILLIAMS:  I don't know.

22      MR. WILLIAMS:  Can I --

23      MR. MacWILLIAMS:  Are we --

24      MR. WILLIAMS:  I will tell you, you go through them.

25  And if you get something.

1          *MR. MacWILLIAMS:*  Yeah.  I sort of did it topically on

2    this one.

3          So Dr. Heimberger, your Honor, is Dr. Embrescia's

4    boss.  She is a medical doctor.  She is in the safety

5    organization.  She is pretty high up the chain in the safety

6    organization.  She was never designated as any Abbott

7    representative.  She is not a designee.  So this is all about

8    her -- this is her personal witness capacity.  And a number of

9    the questions -- now, she hasn't treated a patient since 1989.

10   So she is a medical doctor, but she's safety and

11   pharmacovigilance.

12         And so, for example, "what information prescribing

13   physicians rely upon and will provide to patients."  If an

14   Abbott's witness was designated to speak on that topic, that's

15   one thing.  If a Abbott witness -- or if an expert witness was

16   qualified to speak to that topic, that's another thing.

17         *THE COURT:*  I'm sorry.  Where are you?

18         *MR. MacWILLIAMS:*  I'm sorry, your Honor.  For example,

19   this is Page 72, Line 23 -- is an example of this concept.

20         *THE COURT:*  Okay.

21         *MR. MacWILLIAMS:*  So our point is, this is not

22   testimony that Dr. Heimberger, in her individual capacity,

23   should be called upon to offer into evidence.  It is -- you

24   know, what doctors will rely upon is a matter of speculation

25   from her standpoint.

1          *THE COURT:*  I mean, this seems like a pretty basic

2     innocuous statement.

3          *MR. WILLIAMS:*  I'm glad you didn't say innocuous

4     question because it was my question.

5          *THE COURT:*  Yeah.  That's overruled.  I mean that's

6     relevant.

7          *MR. MacWILLIAMS:*  Okay.

8          *THE COURT:*  It's certainly something that she would

9     have within her personal knowledge.

10          *MR. MacWILLIAMS:*  Well, what some other doctor would

11     rely upon, your Honor?

12          *THE COURT:*  The prescribing physicians?  I mean

13     doesn't one count on the prescribing physician?

14          *MR. MacWILLIAMS:*  I'm sorry.  I didn't hear that part.

15          *THE COURT:*  I mean that's -- they're the learned

16     intermediary, correct?

17          *MR. MacWILLIAMS:*  That is true.  But what facts or

18     labeling information a particular prescriber would rely upon as

19     it relates to the facts of this case, that's really what

20     they're trying to use it for.

21          *THE COURT:*  That's overruled.

22          *MR. MacWILLIAMS:*  Okay.  Page 114, your Honor.

23          114:5 to 9.

24          *THE COURT:*  Okay.

25          *MR. MacWILLIAMS:*  So this question looks fairly

1    innocuous: "You agree that it is Abbott's responsibility to

2    update its label if it feels there is something that needs to

3    be added to that label."

4           What you need, your Honor, is the context that starts

5    just about a page and a half up.  What she is being examined

6    about is Wyeth versus Levine.  And that's not in your cut

7    because it's not been designated, but that was the foundational

8    premise for asking her that question.

9           And among other things, she says, "So I'm not a

10   lawyer, and I'm also not a regulatory specialist, but what I

11   can tell you is what we strive to do.  We strive to monitor our

12   safety profile."  And she continues on.

13          And then the question that is put to her is:  "You

14   agree it's Abbott's responsibility to update its label if it

15   feels there is something that needs to be added to the label."

16          "Yes."

17          Well, that's a totally meaningless question and

18   answer.  One, it is asking the duty question in sheep's

19   clothing.  And, two, "If it feels that there is something that

20   needs to be added," its their responsibility to add it.

21          I don't even know what that means.  But in her

22   personal capacity on speaking to a labeling issue, that is not

23   her bailiwick.  She doesn't speak for the company.  They just

24   want to get another company witness saying it is our

25   responsibility to update the label if we feel.  And it is

1   repetitive, it's redundant, it's outside her personal

2   operational sphere, and her business organization.  It doesn't

3   mean anything.

4           THE COURT:  Do you want to respond?

5           MR. WILLIAMS:  She is a vice president.  She is over

6   Dr. Embrescia.  I forgot her exact title.  It's something

7   global medical vice president or something.  This is a

8   corporate officer making this statement, and the statement

9   stands.  The question and answer are relevant, and there's

10  no -- I see no legal objection to it that I can think of.

11          MR. MacWILLIAMS:  Foundation, relevance.

12          THE COURT:  No.  I mean I think it's not -- it's not a

13  duty thing and it's certainly, if she's the vice president.

14  And it's just...

15          MR. MacWILLIAMS:  Well, your Honor, she is the vice

16  president of safety, surveillance, and pharmacovigilance.  So,

17  again, if we are going to talk -- it can't be that the -- they

18  get to put the vice president under oath and ask her any

19  question they want and say that's admissible because she is a

20  vice president.

21          THE COURT:  Right.  But she is the vice president of

22  what did you just say?

23          MR. MacWILLIAMS:  Safety, surveillance, and

24  pharmacovigilance.

25          THE COURT:  And that goes -- that covers -- I mean

1     updating the label, if there's something that needs to be

2     added.  So I think it's clearly -- so that objection is

3     overruled.

4            MR. WILLIAMS:  I'll make the same deal.  You bring her

5     to trial, and I will waive all this.  I will pay her plane

6     fare.

7            MR. MacWILLIAMS:  Dr. Heimberger and Mr. Williams go

8     way back, your Honor.  I am sure that Dr. Heimberger would jump

9     at the opportunity.

10            MR. WILLIAMS:  Oh, she might jump.

11            THE COURT:  We need something to wake up the jury.

12     So...

13            MR. MacWILLIAMS:  Your Honor, I apologize.  I'm

14     waiting for the transcript.  Excuse me.  Where I'm trying to

15     get to, your Honor, is at Page 723, Lines 3 to 20, where

16     they're asking Dr. Heimberger how many birth defects have been

17     caused by the Depakote.

18            MR. WILLIAMS:  That's out.

19            MR. MacWILLIAMS:  Okay.

20            THE COURT:  Okay.  I didn't get to where were you

21     but...

22            MR. MacWILLIAMS:  I didn't get to where I was going,

23     but no problem.

24            THE COURT:  Okay.

25            MR. MacWILLIAMS:  Is all the causation stuff about FVS

1    at 789 in or out?

2         *MR. WILLIAMS:*  I'm sorry.  Tell me the page number.

3         *MR. MacWILLIAMS:*  789.

4         *MR. WILLIAMS:*  Skipping over to -- wait, wait, wait.

5    789, Line 6?

6         *MR. MacWILLIAMS:*  789, Line 6, yes.

7         *MR. WILLIAMS:*  It's in.

8         *MR. MacWILLIAMS:*  Okay.  Let me try and get to that

9    page, your Honor.

10        *MR. WILLIAMS:*  Your objection is overruled.

11        *MR. MacWILLIAMS:*  She enjoyed this process so much,

12   your Honor, she was invited back for a third deposition.

13        *THE COURT:*  I hope you all plant a tree when this is

14   over.  The amount of paper...

15        *MR. WILLIAMS:*  It wasn't us.

16        *MR. MacWILLIAMS:*  Let the record reflect the delay is

17   induced by me trying to find this on my computer instead of a

18   stack of paper.

19        *THE COURT:*  Okay.  Okay.  That's good.  And I'm guilty

20   because I often have to print things out.

21        *MR. MacWILLIAMS:*  Okay.  That wasn't my question.  The

22   question:  "Does valproic acid cause Fetal Valproate Syndrome,

23   FVS?"

24        That is Dr. Heimberger's personal opinion in April of

25   2014.  She is not an expert witness.  She hasn't been qualified

Deposition Designation Arguments

1   as an expert witness.  She doesn't speak for Abbott on that

2   point.  Your Honor, that would be like bringing in all the

3   tobacco executives and saying, does cigarette smoking cause

4   lung cancer, and having to ask everybody -- it's not an apt

5   analogy because it is not that clear.  But the fact of the

6   matter is, she doesn't get to speak to Abbott on that, and the

7   jury doesn't get to hear her speak on that.  It is a purely

8   expert witness issue.

9          THE COURT:  We have a stipulation from -- we are going

10  to have a stipulation from Abbott that -- as to general

11  causation, correct?

12         MR. MacWILLIAMS:  Yes.

13         THE COURT:  Okay.  Well, I'll sustain your objection

14  to that.  I don't know that we need her saying that.

15         MR. MacWILLIAMS:  Okay.

16         Whether Abbott can cause lower IQ, is that still in?

17  786?

18         MR. WILLIAMS:  Wait, wait, wait.  I crossed -- there

19  is another question on valproic acid and Fetal Valproate

20  Syndrome at 789:23.

21         MR. MacWILLIAMS:  Okay.  Let me look at that one.  My

22  direct question is:  "Does valproic acid cause Fetal Valproate

23  Syndrome, referred in shorthand as FVS?"

24         I think her Honor told us --

25         THE COURT:  Yeah.  That's the same thing.  That's

1    general causation.

2         *MR. WILLIAMS:*  If I may, your Honor.  If the Court

3    would read on, the pertinent part of that is that lays a

4    foundation that shows that that was true as far back as 1978.

5         *MR. MacWILLIAMS:*  Well, if we are not questioning --

6    if we are not contesting general causation, your Honor, we are

7    not contesting it for today.  And Dr. Heimberger doesn't get to

8    speak to what it was -- what the answer to that was in 1978.

9         *MR. WILLIAMS:*  I know.  She is only vice president in

10   charge of safety.  She was probably a bad choice, to choose

11   vice president in charge of safety.

12        *MR. MacWILLIAMS:*  I love Mr. Williams' jury arguments,

13   your Honor, but they are not very compelling as an evidentiary

14   proposition.  I don't even know that Dr. Heimberger was at

15   Abbott or had ever heard of Depakote as of 1978.

16        Her answer was:  "I'm presuming that's true."

17        *THE COURT:*  Yeah.  I will sustain the objection to

18   that.  That's out.

19        *MR. MacWILLIAMS:*  So we had a similar series of

20   questions for spina bifida, and I assume the answer is the

21   same.  We have a similar series of questions for lower IQ.

22        *MR. WILLIAMS:*  Where are you?  Page and line, if you

23   will.

24        *MR. MacWILLIAMS:*  Oh, I'm sorry.  I didn't hear.  I

25   thought were you contemplating.

1            *MR. WILLIAMS:*  No.  No.  I'm sorry.  I was asking,

2   Where are you?

3            *MR. MacWILLIAMS:*  So for spina bifida, it is at 951.

4            *MR. WILLIAMS:*  Okay.

5            *MR. MacWILLIAMS:*  "Now we know you will agree that

6   valproic acid in the Depakote products causes spina bifida,

7   correct?"

8            ANSWER:  "I would agree it can cause spina bifida."

9            Right there, your Honor, that is the quintessential

10  expression of the general causation, specific causation issue.

11  The plaintiffs want to say it as it causes, *i.e.*, it causes and

12  caused it in this case.  And Abbott witness -- or not an Abbott

13  witness -- Dr. Heimberger's responds "I would agree it can

14  cause spina bifida" *i.e.*, I can see the general causation

15  issue.

16           *MR. WILLIAMS:*  What in the world is wrong with that

17  question?  That's pretty darn pertinent.  And it's vice

18  president of -- of safety.

19           *MR. MacWILLIAMS:*  It's only pertinent if we don't have

20  a stipulation, your Honor.

21           *MR. WILLIAMS:*  It is the vice president of safety.

22           What's -- you have to show -- you have to have a legal

23  objection.  And I just don't hear one.  Like is it prejudicial?

24  No.  Is it hearsay?  No.

25           *MR. MacWILLIAMS:*  It is redundant and duplicative.  It

1    is her personal view.  That's not going to -- and -- and, trust

2    me, they are going to present it as if she speaks for Abbott.

3    She doesn't.

4              MR. WILLIAMS:  Well, wait a minute.  Let's take that

5    on for a moment.  How in the world can one say that the vice

6    president in charge of safety doesn't speak for Abbott?

7              MR. MacWILLIAMS:  They're asking her an opinion

8    question on causation, your Honor.  They need to show -- lay a

9    foundation as an expert witness.  That is an opinion.  Does it

10   cause.

11             THE COURT:  I don't know that it's an opinion.

12             MR. MacWILLIAMS:  That is clearly an opinion.

13             THE COURT:  It is asking her knowledge.

14             MR. MacWILLIAMS:  But her -- if that -- assuming it is

15   a matter of debate, so if it is not stipulated to, that's how

16   we get to the assumption that it is a matter of debate.  If it

17   is a matter of debate, then it is clearly an opinion.  It is --

18   it's a fact when we make it a fact by stipulation, in which

19   case and she doesn't need to answer this question for the

20   jury's benefit.  It's not -- if what they're trying to say is

21   doesn't -- I mean -- they're trying to say let's get another

22   Abbott witness to say this.  The jury has heard this from --

23   I've lost count.

24             MR. WILLIAMS:  It is about a six-second question and

25   answer.  And it is their vice president of safety.  That's the

1    relevance.  VP safety.

2         *THE COURT:*  Yeah, I can -- I think it's relevant.  I

3    don't think it is an opinion.  Yeah, I can see the relevance,

4    so I'll let those -- that portion be read.

5         Anything else with her?

6         *MR. MacWILLIAMS:*  Your Honor, yes.  There was an

7    exercise in futility.  This is at Page 905 where Doctor -- or

8    Mr. Williams is trying to walk through some sort of calculation

9    with Dr. Heimberger that required her to get out his calculator

10   or her calculator.  I don't recall particularly which it was.

11        905:23 is where I'm trying to get to, your Honor.

12        And the question was, "Now, can you calculate for me

13   if the background rate is zero -- is .06 how much of an

14   increase?

15        "That is to say it is 1 to 2 percent?

16        "Objection, form and foundation.

17        "Off the top of my head, I probably cannot do the math

18   accurately.  I know that if you look at the French study, the

19   odds ratio is 20."

20        "And nowhere does it say here the odds ratio is 20,

21   right?

22        "So, um, we have, of course, heard six or seven times

23   about that.

24        "Have you ever seen an odds ratio that is above five

25   other than valproic acid?

1           "I don't recall."

2           I don't even know what that means.  Have you seen an

3     odds ratio for what?  And so my objection was to form and

4     foundation.  I don't even know what she is being asked about.

5     Odds ratio for what?  This is 906, Line 20.

6           *MR. WILLIAMS:*  Could I address that?

7           *THE COURT:*  You may.

8           *MR. WILLIAMS:*  An odds ratio is an odds ratio.  And

9     as -- if you recall, Dr. Oakley said that an odds ratio of 20

10    is -- you know, epidemiologists toil in the basements working

11    with odds ratios from zero to three.  And define something

12    that's a 20 is way out of sight.  So my question is, have you

13    ever seen one higher than five.  And that's because, as the

14    Court can understand, seeing something that is such an outlier

15    to be as high as 20 is significant.

16          *MR. MacWILLIAMS:*  Your Honor, has she ever seen an

17    odds ratio of smoking that's higher than five or of what that's

18    higher -- the question and I -- Mr. Williams, trust me, doesn't

19    pay much attention to me when I lodge objections at these

20    depositions.

21          *MR. WILLIAMS:*  Stipulated, your Honor.

22          *MR. MacWILLIAMS:*  So I was trying to communicate to

23    him that there is a problem with your question, Mr. Williams.

24    And, by the way, everybody at their table barks at me if I say

25    anything more than objection, form and foundation.  I get an

 1   earful.  So I'm saying to him at that point, I don't know what

 2   you are asking about and she doesn't know what you are asking

 3   about --

 4          THE COURT:  Where are you with that?

 5          MR. MacWILLIAMS:  This is 906, Line 20, your Honor.

 6          THE COURT:  Okay.  "Have you ever seen an odds

 7   ratio"...

 8          MR. MacWILLIAMS:  And, again, she is supposed to be

 9   looking at Depakote's risks and I don't know -- even if he is

10   asking her about other AEDs, which he is not -- which is the

11   point I made when I lodged the objection -- I don't know how

12   she would necessarily have seen the odds ratio for something

13   else.

14          And her answer is, "I don't recall".

15          So we don't know what she is being asked and her

16   answer is I don't recall, it is just another opportunity for

17   them to have Dr. Heimberger say on the record I don't recall.

18          MR. WILLIAMS:  If you will read on, you will see how

19   it all ties together.  And Mr. MacWilliams was at the

20   deposition and could have clearly asked those questions of his

21   client and cleared that up.  And it is, what it is.  He waived

22   that opportunity and there's where we are.

23          MR. MacWILLIAMS:  Well, your Honor --

24          MR. WILLIAMS:  It's pertinent.

25          MR. MacWILLIAMS:  I'm sorry.  I do not waive

1   opportunities to correct Mr. Williams's questioning technique

2   by lodging an objection to form and foundation when an improper

3   question is asked.  I preserved my opportunity to show up in

4   court in front of you or Judge Williams and say:  We don't know

5   what question was asked and she doesn't -- and we don't know

6   what question she was answering.

7         *THE COURT:*  Well, I don't think it's -- vague I guess

8   is the word.  I mean she's being asked about the -- the rate.

9   She does the math.  She's in charge of safety, right?  She's --

10  what's his name's boss.

11        *MR. WILLIAMS:*  Embrascia.

12        *THE COURT:*  I think it is relevant, so I'll -- I'll

13  overrule the objection to those portions.

14        *MR. MacWILLIAMS:*  All right.  Final question in that

15  series, your Honor.

16        "And do you know why it was left out that the odds

17  ratio was 20?"

18        Another one of plaintiffs' favorite themes.

19        "Objection, form and foundation.

20        "I wasn't involved in the labeling discussions."

21        So she doesn't have a foundation to answer that

22  question.  She doesn't know the answer to that question.  And

23  just because she doesn't know the answer to that question is

24  not relevant or material to anything in this case.  Why is she

25  supposed to know why certain language doesn't appear in the

1    label?  That is totally somebody else's responsibility.  They

2    just want to dress it up and treat it as if everything she

3    doesn't know is a failure somehow of doing her job.  And it is

4    not her job to do that.

5         MR. WILLIAMS:  It's an appropriate question to the

6    vice president in charge of safety.

7         MR. MacWILLIAMS:  How?

8         THE COURT:  I agree.  I agree.  I mean it is relevant

9    and she says I wasn't involved in the labeling discussions.  I

10   mean the jury can take that for -- for what it is.  So that

11   will be overruled.

12        Is that it with Heimberger?

13        MR. MacWILLIAMS:  No, your Honor.

14        909.  Okay.  So this was the math exercise to which I

15   alluded, your Honor.  909 starting at Line 4:

16        "So can you calculate for me if the ratio and the

17   background, the risk is .06 to .07, can you do the math to tell

18   me what is the meaning of 1 to 2 percent if the background is

19   .06 to .07?

20        "Objection, form and foundation.

21        "Can you do the math?

22        "I can't do the math in my head."

23        So now we are going to challenge Dr. Heimberger

24   apparently because she's the vice president of safety that she

25   is supposed to be a math whiz.  And if she lets Mr. Williams

1    down in his expectations, she is going to be cast about for.

2         "If I give you a calculator, can you do that?

3         "Probably."

4         Oh, so now it's does she know how to operate a

5    calculator.

6         MR. WILLIAMS:  We're hoping she does.

7         MR. MacWILLIAMS:  And then Mr. Williams walks her

8    through the steps that he wants her to do in operating the

9    calculator to get to the number that he wants to get to.  It is

10   pure argument.  Dr. Heimberger's ability to do the math in her

11   head, to do it with the aid of a calculator, to do it standing

12   on her head, none of these things are relevant.

13        MR. WILLIAMS:  We have the vice president doing the

14   calculation.  And, your Honor, this is, you know, pared down.

15   Mr. MacWilliams went back and had her calculated -- it depends

16   on a range of numbers and he had her calculate it where it was

17   1429 percent.  And I said, okay, so the best case scenario is

18   it's 1429 percent increase to 3,333 percent increase.  And she

19   said yes.  I mean she did the math.

20        THE COURT:  Right.  I agree.  I think it is relevant.

21   I mean she did it, she is the vice president of safety.

22        MR. MacWILLIAMS:  Respectfully, your Honor, I think we

23   are getting way afield of safety when -- I mean we have

24   attributed a lot to her as the vice president of safety.

25        THE COURT:  Well...

1              *MR. MacWILLIAMS:*  Okay.  Page 796, your Honor.  And I

2     did these topically, so I apologize for backing up in the

3     transcript but this is the NAAEDPR, this is the North American

4     registry discussion, Dr. Holmes's registry and they asked her

5     the question why Abbott sponsored the NAADPR.  And I think, if

6     I am recalling correctly, the e-mail in which that -- her view

7     on that is communicated is dated in something like 2002.  So

8     well after.  And now we are talking about the sponsorship of a

9     registry that didn't generate data because it wasn't available

10    until 2002 or 2003.

11             *MR. WILLIAMS:*  If I may respond.  It is a historical

12    document.

13             What happens vice president to vice president was an

14    e-mail.  Another vice president of Abbott was asked, why did we

15    get into the Holmes study.  And somebody said, well, ask

16    Tracey.  So they said, Dr. Heimberger, why did we get into

17    this, or Tracey.  Why did we get into this?  And so it is a

18    historical looking back to 1996.  And her words are very

19    telling.  She said we did it because it was going to go -- and

20    I'm paraphrasing -- because it was going to go forward whether

21    we were involved or not.  And we did it so we could get a heads

22    up and so that we could have somebody have some input.

23             So she -- she didn't say we did it for safety or we

24    wanted to know.  She said we did it because we were forced to

25    and we wanted a heads up.  And that's her words.  And it's a

1    historical document as to what happened --

2         THE COURT:  Well, and I agree that's relevant.  That's

3    a big issue in the case is, you know, what -- what Abbott did

4    to study the harmful effects.  And I think why they got into

5    that registry, even if it was 2002, is relevant.  And she is

6    the one who is explaining why here in her responses.  So that

7    objection is overruled.

8         MR. MacWILLIAMS:  Your Honor, then 786, Line 12.

9         "So valproic acid in Depakote is unique in that one of

10   the things it is also four times" -- this is the four times

11   higher discussion.  Again, we are taking Dr. Heimberger's --

12        MR. WILLIAMS:  Whoops, whoops.

13        Is that out?

14        You won.

15        MR. MacWILLIAMS:  Okay.

16        THE COURT:  We're agreeing to take that out?

17        MR. MacWILLIAMS:  That line --

18        MR. WILLIAMS:  Yes, your Honor.

19        MR. MacWILLIAMS:  Is that 786?

20        THE COURT:  Twelve to 16 -- well, 12 to -- I'm sorry.

21        MR. MacWILLIAMS:  Twelve to 20 is what I have there,

22   your Honor.

23        MR. WILLIAMS:  Judge, so that y'all both know that

24   whole page that started Number 9, Page 780 through Number 18,

25   Page 788.  That's all out.

Deposition Designation Arguments

1          *MR. MacWILLIAMS:*  How about 704:21 to 24?

2          *MR. WILLIAMS:*  We are going backwards.

3          *MR. MacWILLIAMS:*  It's an earlier transcript, same

4     subject.

5          *MR. WILLIAMS:*  It's out.

6          *THE COURT:*  Yeah.

7          *MR. MacWILLIAMS:*  Okay.

8          Okay.  I think we can work out the rest of those then,

9     Mr. Williams.

10          Your Honor, last one, last one, last topic.

11     Dr. Heimberger regarding marketing practices or the impact of

12     sales of Depakote on the number of AEDs -- or AEs, excuse me.

13     So the example of this, your Honor, is at 853, Line 21, if

14     that's still in play.

15          *MR. WILLIAMS:*  Wait, wait, wait.

16          853:21 through 854:04?

17          *MR. MacWILLIAMS:*  854:08 I think.  Yes.

18          *MR. WILLIAMS:*  Judge, I'm going to be a nice guy and

19     let him win this one.  How about that?

20          *THE COURT:*  Yeah.  Okay.

21          *MR. MacWILLIAMS:*  Um.

22          *THE COURT:*  Take that out.

23          *MR. WILLIAMS:*  You said it was the last one.

24          *MR. MacWILLIAMS:*  I said the last topic.

25          Did I not say the last topic, your Honor?  You heard

1    me.

2              THE COURT:  Last topic.  So there is another one on

3    the same topic?

4              MR. MacWILLIAMS:  Yes, I believe so.

5              MR. WILLIAMS:  I'm not going to let him win the next

6    one.

7              MR. MacWILLIAMS:  But they are all on the same page.

8    920, Lines 10 to 23.

9              MR. WILLIAMS:  Give me just a moment.

10             MR. MacWILLIAMS:  So she is being asked about the

11   interplay, your Honor, between sales and...

12             MR. WILLIAMS:  Let me respond.  This was, as Judge

13   Williams said -- what was his exact word?  Extremely evasive?

14   Something -- not only evasive but extremely evasive witness.

15   And so it goes to -- I mean what -- you can't believe what we

16   could show to show how much she fights you on stuff.  But I

17   think that goes to her credibility.  I mean it's a common sense

18   question and -- and as vice president in charge of safety, one

19   would think she'd know the answer to that question too.  I

20   would pray she would know the answer to that question.

21             MR. MacWILLIAMS:  "Now, then does it make sense that

22   if you increase the sales of Depakote that you would increase

23   the amount of birth defects."

24             That is calculated to suggest that nothing...

25             THE COURT:  Mr. Ball is getting up, so I'm just going

1   to rule.  I agree.  I'm going to sustain the objection to that

2   because I think it is really -- it is argument.  I mean that's

3   going to be Mr. Williams's argument.  And I don't know it is

4   proper.  I mean she says she doesn't even know, so I will

5   sustain the objection to that question .

6           MR. MacWILLIAMS:  But Mr. Williams is going to claim

7   he let me win it anyway, your Honor.

8           I have no further --

9           THE COURT:  Okay.

10          MR. MacWILLIAMS:  -- objections on Heimberger.

11          THE COURT:  Is that it with depos as well?

12          MR. MacWILLIAMS:  We done?

13          THE COURT:  We need to read the exhibits from

14  Doctor -- I'm drawing a blank.  Dr. Henderson.

15          MS. TREVINO:  That's correct.

16          So I just -- I'll reiterate --

17          MR. MacWILLIAMS:  Can we wait just a minute to get the

18  authority?

19          THE COURT:  Okay.  Yes.  We need Donna, the authority.

20          And I really appreciate you all working with Deana

21  every day or at the end of every week I guess she said you are

22  going through and so we're making sure we are all on the same

23  page and...

24          Okay.  So Dr. Henderson from this morning.

25          MS. TREVINO:  Do you want -- I know Mr. Sampson read

1    it, so do I need to re-read the transcripts of Taber,

2    McGonagle, and Ralston or we're all set on that.

3            *COURTROOM DEPUTY:*  I have them.

4            *MS. TREVINO:*  Okay.  Super.

5            Okay.  So for Dr. Henderson, Trial Exhibit 1907.  It

6    is medical records from University of Chicago.  The Bates

7    labels are DK001425 through 2082.

8            Trial Exhibit 2431 is dental records for Danny Kaleta

9    from Lurie Children's Hospital of Chicago.

10           2147 is photographs from the day-in-the-life video.

11   The Bates number is DK010876.

12           Then Trial Exhibit 2150 is paragraph 56 from the

13   day-in-the-life.  Bates label DK010879.

14           Then Trial Exhibit 2151, photograph 57 from the

15   day-in-the-life.  And the Bates label is a DK010880.

16           Then Trial Exhibit 2155, photograph 61, a

17   day-in-the-life.  Bates labeled DK010884.

18           And the last one is Trial Exhibit 2156, photograph 62.

19   Bates labeled DK010885.

20           *THE COURT:*  Any objection, Abbott?

21           *MR. BALL:*  Actually I just said that on the record a

22   while ago.

23           *MS. RICHARDS:*  Okay.  Just one --

24           I'm sorry.  Jennifer Salim-Richards.  I apologize.

25           On the first exhibit that she read, which is Trial

1    Exhibit 1907, this is something your Honor has asked the

2    parties to work out.  I understand that we're still

3    discussing -- it was actually like a 200-page record.  We only

4    used two pages.  It was the operating summary.  Plaintiffs

5    would assume only that piece go back anyway.  In fact, it was

6    part the compilation from yesterday.  So we really just need to

7    work out -- so we are not bombarding the jury with thousand of

8    pages.  It is a common record that could be -- it was in the

9    set from yesterday.  I can also give it another number but it's

10   an administrative issue.  The parties really just need to come

11   to an agreement on.  So for right now I would like to just hold

12   that one off before we release 1907 to the jury.  I apologize

13   for the confusion.

14          THE COURT:  Okay.  All right.  We will hold on that.

15          MR. BALL:  If you are saying it is part of 200, why

16   don't you just give that two pages a new number and we won't

17   have a problem with that.

18          MS. RICHARDS:  Great.  I will do that and reoffer and

19   make it clear that --

20          COURTROOM DEPUTY:  Is there a new number?

21          UNIDENTIFIED SPEAKER:  2490.

22          MS. RICHARDS:  Okay.  So the record is clear, the

23   exhibit that was introduced in front of the jury today as

24   Exhibit 1907 was actually only a subpart of 1907.  Plaintiffs

25   now offer the operating summary done by Dr. McKesson and

1    discussed by Dr. Henderson as new Exhibit Number 2490.

2         *MR. BALL:*  No objection.

3         *THE COURT:*  2490 no objection.

4         Okay.  So any other objections to those exhibits?

5         Okay.  Those exhibits from Dr. Henderson's testimony

6    will be admitted.

7         So remind me again.  Tomorrow we have Dr. Lott.

8         *MR. BOUNDAS:*  We have Dr. Lott first thing in the

9    morning.  Then we will probably play -- if he doesn't go all

10   morning, play some video.  And then Mary Kaleta will be in the

11   afternoon and then -- and thank you for working through all

12   these videos.

13        *THE COURT:*  No, I'm glad we did this.  I mean it was a

14   good afternoon to give the jury off.

15        *MR. BOUNDAS:*  Yes.  So we will then have videos to

16   play, you know, either through the rest of the afternoon or as

17   far as that takes us.  And then Friday we have the life care

18   planner Buddy Brennan and then the economist Gibson.  And then

19   if we have one or two depos to play that's it.  We will rest

20   Friday.  And I don't anticipate Friday going all day by any

21   stretch with those two witnesses.  They're relatively short

22   witnesses.  So maybe midafternoon Friday or so.

23        *THE COURT:*  Okay.  And then maybe -- do we have some

24   of your depositions then we need to start taking up?

25        *MR. BALL:*  I think the major the depositions we have

1     are the three doctors.  But do we have any issues on those?

2          *MR. BOUNDAS:*  Yeah.  The only issue -- there is a

3     major issue with Dr. McGonagle.  I don't think we need to hash

4     that out now.  But his -- he was asked a lot of questions about

5     warnings that were given in 2000 --

6          *THE COURT:*  Is that the expert?

7          *MR. BOUNDAS:*  No, no, he was a prescribing doctor.

8          *THE COURT:*  But is that the issue that -- that's an

9     undisclosed expert opinion?

10         *MR. BOUNDAS:*  No, no, the issue is simply that he

11    was -- I think they're trying to offer testimony that he was

12    repeatedly warning Mary Kaleta about risks of Depakote all the

13    way -- you know, in 2002, 2003, 2004.  This may even come up

14    tomorrow, I don't know.  But, you know, if the current warning

15    label is out, it is kind of hard to allow in testimony about

16    what Mary was warned about, say, in '06.

17         *MR. BALL:*  I need Paul here.  We could do that at the

18    end of the day Friday.

19         *THE COURT:*  So you -- are those really the only depos

20    then that you're offering?

21         *MR. BALL:*  No, we are considering now this -- I didn't

22    know until an hour ago who they weren't calling, you know.  And

23    so there may be some depos we will be offering on people they

24    didn't call that we expected them to call.

25         *THE COURT:*  Okay.

1          *MR. BALL:*  So I've got to go back and hash that out.

2          *THE COURT:*  I'm not sure whose this is but I don't

3     think I need it, so I'll give that back.

4          Okay.  We'll work on that.  And then --

5          *MR. BALL:*  So what -- kind of where we were yesterday,

6     if they are going to, you know, close Friday that's much

7     earlier than we had expected and they've abandoned or not -- I

8     don't mean abandoned.  That sounds too strong.  They are not

9     putting forward some witnesses.  We have -- our first witness

10    is out of town and we haven't been able to cancel some stuff

11    and everything to be here to start first thing Tuesday.

12         I still think the idea of spending Monday on jury

13    instructions and whatever else makes sense under the

14    circumstances and directed verdict, that kind of thing.

15         *THE COURT:*  Okay.  So I was I'm going to ask you that.

16    So you didn't -- weren't able to make any -- I mean I'm not

17    faulting you.

18         *MR. BALL:*  No.

19         *THE COURT:*  You were not able to make any progress on.

20         *MR. BALL:*  No.

21         *MR. BOUNDAS:*  I don't think -- it's certainly up to

22    the Court.  We don't have an objection to that.  The only

23    question I was -- you said we are not calling witnesses,

24    plural.  Who aren't --

25         *MR. BALL:*  You are not calling Dr. Smith, you're not

Deposition Designation Arguments

```
 1    calling Dan Kaleta.
 2              MR. BOUNDAS:  Oh, I got you.  I just --
 3              MR. BALL:  You're not calling --
 4              MR. BOUNDAS:  No, I wanted to make sure I wasn't
 5    forgetting a witness.  Because...
 6              THE COURT:  Who am I not calling.
 7              MR. BOUNDAS:  Yeah, I don't know.  I didn't want to
 8    rest and --
 9              THE COURT:  Okay.  Well, let's see -- let's see where
10    we get Friday.  I mean I -- you know, I'm willing -- certainly
11    willing to just let the jury have Monday off and we can hammer
12    out anything, including jury instructions.
13              MR. MacWILLIAMS:  And on that, your Honor, if I recall
14    correctly, you have those that you are working on you.  Are you
15    going to send our way.
16              THE COURT:  Right.  What I will --
17              MR. MacWILLIAMS:  I was just wondering when are we
18    likely to get those?
19              THE COURT:  Probably not until either over the weekend
20    or Monday morning.
21              MR. BALL:  That will be fine.
22              THE COURT:  I was going to work on them last weekend
23    but then y'all gave me more stuff to work on.  So...
24              MR. MacWILLIAMS:  I know the feeling, your Honor.
25              THE COURT:  We have been working on them and so
```

1   just -- I'll say again that what I do is when I give you a

2   packet -- this is my draft, so to speak.

3           And then I want to have an informal discussion --

4   we're not on the record, because then that just clogs up the

5   record with a bunch of nonsense that doesn't really matter --

6   to hammer out.  Because at the end of the day it is -- you

7   know, we all have an interest in making sure that they're

8   correct.  They are my instructions, so I really, honestly, seek

9   your input.  They can't be argumentive.  They have to state

10  what the law is.  So we will do that informal.  That often

11  gives me things to think about to go back then and change.  And

12  then I'll give you at some point then a final packet.  And then

13  that's what when we go on the record, this is what I'm going to

14  give, plaintiffs do you have any objections to what I'm going

15  to give.  You would say, we object to Page 10 because blah,

16  blah, blah; we object to Page 14 because blah, blah, blah.

17          And I look to you, same thing.  What do you object to

18  what I proposed to give.

19          *MR. BALL:*  That's more --

20          *THE COURT:*  Succinctly state your objection.  It is

21  not then a big long argument but what is your objection so the

22  Court of Appeals sees what your objection is.

23          And then I'll look and say, do plaintiffs have any

24  others you wish to offer that I've not.  So that's where in our

25  informal discussions you say, I don't think, you know, this

1    Instruction Number 10 accurately states the law, but I propose

2    this one.  That would be the point when you give me that.  Same

3    thing.

4         Or if my packet doesn't include something that you

5    think needs to be instructed, not instead of but in addition

6    to, then that's the time to say that.  But I want all that out

7    in the informal because I might have just overlooked one.

8         MR. BALL:  And that's going to be Monday?

9         THE COURT:  Hopefully.

10        MR. BALL:  We will start the process.

11        THE COURT:  Probably start the process on Monday.

12        MR. BALL:  Because I don't know...

13        THE COURT:  We will have to do the final -- I don't

14   think the final instruction conference will be until close to

15   the end.

16        MR. BALL:  Yeah.  Okay.

17        THE COURT:  So we know for sure --

18        MR. BALL:  So this will be a getting started type of

19   thing.

20        THE COURT:  Right.

21        MR. BALL:  Okay.  Good.  Good.

22        THE COURT:  Okay.  All right.  Well, thank you

23   everyone.  This was very productive.

24        I told the jury to be back at nine.  I'll be here at

25   8:30 in case we have anything to take up.

1          *MR. MacWILLIAMS:*  What are the chances?

2          *MR. BALL:*  I will give you a forewarning I thought

3     there were and there are some cases ruling the inadmissibility

4     of profit margins.  I'm going to send them to you before that

5     is a final decision you make.

6          *THE COURT:*  Okay.  All right.  Thank you.

7                              -oOo-

8                       REPORTER'S CERTIFICATE

9          I, Molly N. Clayton, RPR, FCRR, Official Court Reporter
      for the U.S. District Court, Southern District of Illinois, do
10    hereby certify that I reported with mechanical stenography the
      proceedings contained in pages 1904 - 2036; and that the same
11    is a full, true, correct and complete transcript from the
      record of proceedings in the above-entitled matter.

12              DATED this 12th day of March, 2015.

13

14                          *s/Molly Clayton, RPR, FCRR*

15                          _____

16

17

18

19

20

21

22

23

24

25

Deposition Designation Arguments