IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **J.F., a minor by BEATRICE SIFUENTES individually as next friend of J.F.,** ) ) ) | |
| **Plaintiff,** ) ) | |
| vs. ) ) | Case No. 14-CV-847-NJR-SCW |
| **ABBOTT LABORATORIES, INC.,** ) ) | |
| **Defendant.** ) | |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Pending before the Court is Plaintiff's Motion to Substitute Dr. David Kessler for designated expert Dr. Cheryl D. Blume. (Doc. 563). Dr. Cheryl Blume has been Plaintiff's declared regulatory expert since at least 2014. (Doc. 576, at p. 2). In addition to the *Sifuentes* case, Dr. Blume was and is the declared regulatory expert in other Depakote cases in this mass action. *See e.g.* 576-4 (excerpts from the *Kaleta* trial held before this Court in March 2015); (Case No. 12-cv-52, Doc. 847, at p. 8) (noting Dr. Blume's participation in *Sifuentes*[1], *Dotegowski*, *Pyszkowski*, and *Bonner.)*

*Sifuentes* was originally selected as bellwether trial, along with the *Kaleta* and *Pyszkowski* cases, on July 25, 2014. (Doc. 1). The Court issued a Scheduling Order on August 14, 2014, which set the deadline for Plaintiff to provide her Rule 26(a)(2) expert

---

[1] The *Sifuentes* case was originally brought by Michelle Leal, who was later substituted for Beatrice Sifuentes on February 24, 2016. (Doc. 515). References to the "*Leal*" case throughout the record are references to the currently pending *Sifuentes* case. The Court will refer to the case globally as *Sifuentes*, regardless of whether an event occurred before or after the date of substitution.

disclosures on October 1, 2014. (Doc. 15). Defendant asserts that on October 1, 2014, Dr. Blume was designated as the regulatory expert for all three bellwether trials. (Doc. 576, at p. 3). Prior to her deposition in *Sifuentes*, Plaintiff provided a billing summary for the work conducted by Pharmaceutical Development Group, Inc. ("PDG.")[2] (Doc. 576-1, at p. 2). The billing summary only provides two values: the year in which work was conducted (starting in 2011 through November 20, 2014), along with a dollar amount charged for each year. *Id.* The total amount charged was $917,331.97. *Id.* There is no further breakdown provided in the document. *Id.* During Dr. Blume's deposition, Defendant asked questions concerning her billings in the Depakote case. *See e.g.*, (Doc. 89-8, at p. 4).

There is no indication in the record that Dr. Blume is unavailable to serve as an expert witness in this or any other case. Instead, Plaintiff's motion rests upon the perceived prejudice resulting from Defendant's cross examination of Dr. Blume concerning the fees she was paid in this and other Depakote cases. (Doc. 563, at p. 2). Plaintiff justifies the substitution as follows:

> Abbott has routinely made Dr. Blume's fees *in other cases* a focal point of its cross-examination at trial. In fact, Plaintiff anticipates that Abbott will vehemently oppose this motion precisely because they intend to engage in this type of cross-examination and present Dr. Blume's total fees to impugn her credibility in this case, which would be unfairly prejudicial to J.F.

(Doc. 563, at p. 2). Defendant counters by noting that experts are customarily cross-examined on the fees they were paid to testify and that nevertheless, Plaintiffs have never filed a motion *in limine* concerning the subject in any prior case. (Doc. 576).

---

[2] PDG is the corporation created, owned, and operated by Dr. Blume through which she performs her work. (Doc. 331, at p. 36-37; 46).

The Federal Rules of Civil Procedure do not expressly delineate the process or standard a court should utilize when faced with a motion to substitute an expert. When faced with such a motion, district courts in the Seventh Circuit take one of two approaches. Certain courts view the motion as a request to reopen the deadlines imposed in the scheduling order under Federal Rule of Civil Procedure 16(b)(4). *See e.g., Lincoln Nat. Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, No. 1:04-cv-396, 2010 WL 3892860, at *2 (N.D. Ind. Sept. 30, 2010). Other courts utilize Rule 26(a)(2)(D) and 37(c)(1) to analyze whether the replacement expert should be excluded as a discovery violation. *See e.g., Assaf v. Cottrell, Inc.*, No. 10-cv-0085, 2012 WL 245196, at *2 (N.D. Ill. Jan. 26, 2012).

The analysis under Rule 16(b)(4) requires the Court to assess whether the party's request demonstrates good cause. When considering whether good cause exists, "the primary consideration for district courts is the diligence of the party seeking amendment." *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011). Rule 37(c)(1) requires the Court to assess whether there is a substantial justification or harm associated with the failure to disclose the expert. FED. R. CIV. P. 37(c)(1); *Tribble v. Evangelides*, 670 F.3d 753, 758 (7th Cir. 2012). In making a Rule 37(c)(1) determination, the Court is to consider: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified; (2) the ability of that party to cure the prejudice; (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court; (4) bad faith or willfulness in failing to comply with the court's order. *Spray-Rite Service*

*Corp. v. Monsanto Co*, 684 F.2d 1226, 1245 (7th Cir. 1982).

Courts faced with a similar motion to substitute an expert witness have found the two standards "coexistent." *See e.g. Fid. Nat. Fin., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*, 308 F.R.D. 649, 652 (S.D. Cal. 2015); *but see Carlson v. Fewins,* No. 1:08-cv-991, 2016 WL 7971764, at *1 (W.D. Mich. Oct. 19, 2016) (finding different burdens imposed by the two rules). This Court need not determine whether the distinctions between Rule 16(b)(4) and Rule 37(c)(1) are ones of semantics or substance because neither rule is met by the facts before the Court.

Plaintiff has failed to demonstrate any meaningful diligence in moving to substitute her regulatory expert. Dr. Blume was first disclosed to Abbott late in 2014, and questioning her on the fees she was paid has been a known Abbott trial strategy since the *Kaleta* trial in March 2015, if not earlier.[3] Plaintiff's counsel designated Dr. Kessler as the regulatory expert for other Depakote trials in January 2016. (Doc. 563, at p. 1). Following the January 2016 disclosure date, *Sifuentes* was reset for a June 2016 trial date, and although the trial was later vacated, Plaintiff did not seek to substitute Dr. Blume in favor of Dr. Kessler at that time. Certainly this Court is aware that the floating nature of the trial dates for the cases in que lowers the impetus to file relevant motions. It cannot be overlooked, however, that Abbott's cross examination strategy has remained virtually unchanged through multiple trials *after* Dr. Blume's designation in this case, and Plaintiff was prepared to go to trial with Dr. Blume as the regulatory expert even despite the disclosure of Dr. Kessler months prior.

Besides a lack of demonstrated diligence by Plaintiff, the reason alleged in

---

[3] Plaintiff was arguably on notice concerning Abbott's cross strategy since Dr. Blume's deposition.

support of the substitution—i.e., prejudice created through cross examination on the fees Dr. Blume was paid in this "*and other cases*"—is not a substantial justification or basis to establish good cause. Although not subject to a bright-line rule, courts routinely find good cause when unexpected circumstances, outside of the moving party's control, prevent a declared expert from testifying. *See, e.g., McCann v. Cullinan*, No. 11-cv-50125, 2015 WL 4254226, *1 (N.D. Ill. July 14, 2015) (Describing good cause as being present when there are "illness, mishaps, electronic discovery snags, true emergencies and the recalcitrance of non-party individuals and corporations."); *Assaf v. Cottrell, Inc.*, No. 10-cv-0085, 2012 WL 245196 (N.D. Ill. Jan. 26, 2012) (Granting substitution when Plaintiff's expert witness had previously testified for Defendant and signed a confidentiality agreement with them, creating a conflict of interest.); *Lincoln Nat. Life Ins. Co. v. Transamerica Financial Life Ins. Co.*, No. 1:04–cv–396, 1:06–cv–317, 2010 WL 3892860, *3 (S.D. Ind. Sept. 30, 2010) (Allowing the defense to substitute an expert after discovering that he would be "incarcerated in federal prison and, needless to say, unavailable to testify at the trial.") Plaintiff has provided no evidence that Dr. Blume is unable to testify, and the fees paid to Dr. Blume are not an unexpected circumstance outside of Plaintiff's control.

While the Court has very little information concerning the fee arrangement or employment parameters of Dr. Blume, this issue was at a minimum influenced by Plaintiff's own choices. Whether Dr. Blume was exceedingly inefficient in preparing her

report[4] or was engaged to prepare reports for all or some of the other Plaintiffs, the information presented to Abbott included a very vague billable summary with only two values—year and dollar amount. If this is the most detailed breakdown Dr. Blume provided concerning her payment, then there can be no surprise when Abbott exploits a $900,000 listed fee payment.

Furthermore, Dr. Blume testified in the *Kaleta* trail *on direct examination* that the Depakote "project" required roughly "6,000…person hours" to complete. (Doc. 331, at p. 67). This was a clear effort by counsel to bolster the credibility of Dr. Blume in the *Kaleta* trial by demonstrating how thorough she and her company were in developing her opinion. Whether true or not, the impression provided to the jury was that she and her team spent 6,000 hours working on the *Kaleta* case. It is axiomatic then that Abbott would ask how much she and her team were paid for those 6,000 hours of work. *See e.g.*, (Doc. 346, at p. 64).

Even if Dr. Blume provided an itemized list breaking down her work for each individual Plaintiff, the substitution of Dr. Kessler would not alter the "unfair prejudice" alleged by Plaintiff. Dr. Kessler charges **double** the fee for his litigation consultation services as Dr. Blume. *Compare* (Doc. 346, at p. 64) (where Dr. Blume testifies that she charges $400-$500 per hour); *with* (Doc. 563-3, at p. 10) (where Dr. Kessler testifies that he charges $1,000 per hour). Also, for at least one Plaintiff, Dr. Kessler indicated that he "guessed" his billings up to the point of the deposition were approximately 250 hours of time. (Doc. 563-3, at p. 7). These two points, coupled with the implication that Dr. Kessler

---

[4] *Compare* (Doc. 331, at p. 67) (where Dr. Blume asserts that her work in the Depakote matter consumed more than 6000 "person hours"); *with* (Doc. 563-3, at p. 7) (where Doctor Kessler asserts an estimate that his work on this matter consumed 250 hours or work).

was designated as the expert in at least three cases quickly demonstrates that Dr. Kessler will eclipse the $1,000,000 mark in total fees in quick order—if he has not already done so. On the facts before the Court, there is no discernable distinction between Dr. Kessler's and Dr. Blume's fees.

Finally, Abbott asserts that the same attorneys representing J.F. never filed a motion *in limine* concerning the fees paid to Dr. Blume when *Sifuentes* was reset for trial and in at least two other cases that followed *Kaleta*. (Doc. 576, at p. 15). This fact alone undercuts Plaintiff's position and shines a light on the true motivation behind the substitution of Dr. Blume. Plaintiff had two separate opportunities in this very case to file a motion *in limine* concerning Dr. Blume's fees and yet she did not avail herself of the opportunity. This is especially telling since the second window to file a motion *in limine* was in May 2016, four months after Dr. Kessler was designated and over a year after the *Kaleta* trial. The Court also notes that Plaintiff did not move in the alternative to exclude the "unfairly prejudicial" cross examination technique in the instant motion to substitute. Whether there is a perceived tactical advantage in using a former head of the FDA as the regulatory expert or simply a case of buyer's remorse, there can be little doubt that Abbott's cross examination strategy was not the true motivation for Plaintiff's motion.

The comparison between the substitution of Dr. Willmore and the instant motion presents a clear contrast. Dr. Willmore's unavailability resulted from an unexpected illness that impacted his ability to accurately and effectively testify at trial. It developed completely outside of the control or influence of Abbott and was quickly addressed once

it became known to Abbott. Conversely, Dr. Blume is available to serve as an expert, and her fees do not impact her ability to testify at trial. Indeed, the fee structure utilized to pay an expert is something completely within Plaintiff's locus of control.

Even when the Court exclusively focuses on the four *Spray-Rite* factors, Plaintiff's motion still fails. Plaintiff's regulatory expert provides key support to the allegation that the drug's label did not sufficiently warn of the risk associated with ingesting Depakote while pregnant. The testimony forms one of the central pillars in Plaintiff's case. Defending against that testimony is therefore of vital importance to Abbott. Given the way this request unfolded and the significance of the regulatory expert's testimony, the prejudice and surprise to Abbott is apparent.

Dr. Kessler has been a known Plaintiff expert in other Depakote cases for over a year, and seeking to substitute him in after such a long period is without a doubt surprising. The fact that Abbott deposed Dr. Kessler in the past does not overcome the prejudice created by allowing his substitution, especially when that deposition was taken in the context of cases with an entirely different prescribing indication.[5]

Plaintiff's assertion that because Abbott was aware of and deposed Dr. Kessler in other cases he can easily slide into *Sifuentes* is simply inaccurate. For example, as a former head of the FDA, Dr. Kessler possesses significantly different qualifications than Dr. Blume, who never worked for the FDA. This distinction alone dramatically alters the testimony these two doctors provide (a distinction that likely lies at the heart of the motivation behind the instant request). The bottom line is that Dr. Kessler cannot be

---

[5] In *Sifuentes,* Dr. Blume was deposed in connection with the mother's epileptic disorder, whereas Dr. Kessler was deposed in cases where Depakote was allegedly prescribed for psychiatric disorders.

easily interchanged into the case without a partial or complete retooling of Abbott's defense. Requiring as much, even though a firm trial date has yet to be reset, would unfairly burden and prejudice Abbott for no valid reason.

As to the fourth factor, bad faith or willfulness, there does not appear to be either in connection with Plaintiff's initial compliance with the Court's Scheduling Order. In the spirit of this factor, however, Plaintiff has shown a lack of diligence in raising this issue. Plaintiff has been aware of Abbott's trial strategy regarding Dr. Blume for many months, yet the issue was not once viewed by Plaintiff as significant enough to raise in any form during the times the case was set for trial. Making the substitution request after such a long passage of time, combined with Plaintiff's failure to raise any similar concerns earlier when the opportunity was present, weighs against granting the expert substitution, even if the initial lack of disclosure in compliance with the Scheduling Order was not in bad faith.

Dr. Kessler and Dr. Blume are not easily interchangeable witnesses. The difference in their employment history alone colors their testimony and delivery, forcing a dramatically different approach. Plaintiff's assertion concerning the perceived prejudice from the fees Dr. Blume charges also presents an illusory argument as Dr. Kessler's fees are literally double those of Dr. Blume. Even if this line of questioning was overly prejudicial or improper, the appropriate vehicle for resolving such an assertion is through a motion *in limine*, not the wholesale substitution of the central expert witness at the eleventh hour. The lack of diligence in seeking a substitution, despite a defense strategy that has remained virtually unchanged since 2014, cannot be overstated.

For these reasons, Plaintiff's Motion to Substitute Dr. David Kessler for designated expert Dr. Cheryl D. Blume (Doc. 563) is **DENIED**.

**IT IS SO ORDERED.**

DATED:   March 17, 2017

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**